RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 20a0059p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

J.H., by Conservator Betty Harris,

*Plaintiff-Appellant*,

*v.*

No. 18-5874

WILLIAMSON COUNTY, TENNESSEE; STEVE MCMAHAN; BETSY ADGENT,

*Defendants-Appellees*.

─────────────────

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:14-cv-02356—Aleta Arthur Trauger, District Judge.

Argued:  May 8, 2019

Decided and Filed:  February 27, 2020

Before:  COLE, Chief Judge; STRANCH and READLER, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:**  Connie Reguli, LAWCARE-FAMILY LAW CENTER, Brentwood, Tennessee, for Appellant.  Lisa M. Carson, BUERGER, MOSELEY & CARSON, PLC, Franklin, Tennessee, for Appellees.  **ON BRIEF:**  Connie Reguli, LAWCARE-FAMILY LAW CENTER, Brentwood, Tennessee, Larry L. Crain, CRAIN | SCHUETTE ATTORNEYS, LLC, Brentwood, Tennessee, for Appellant.  Lisa M. Carson, Lee Ann Thompson, BUERGER, MOSELEY & CARSON, PLC, Franklin, Tennessee, for Appellees.  Daniel M. Greenfield, RODERICK & SOLANGE MACARTHUR JUSTICE CENTER, Chicago, Illinois, for Amici Curiae.

COLE, C.J., delivered the opinion of the court in which STRANCH J., joined. READLER, J. (pp. 19–24), delivered a separate opinion concurring in part and in the judgment.

———————————

**OPINION**

———————————

COLE, Chief Judge.    J.H., a 14-year-old boy and pretrial detainee, was placed in segregated housing in Williamson County's juvenile detention facility after three other juveniles alleged that he threatened to assault them.  J.H. alleges that his placement in segregated housing from November 17 to December 19, 2013, amounted to unconstitutional punishment through the means of solitary confinement.  He also alleges that a Williamson County detention monitor, Juan Cruz, sexually assaulted him during this period; that this assault was a direct result of Williamson County's failure to train Cruz; and that during his placement in segregated housing, detention facility officials failed to provide adequate medical care.  The district court granted summary judgment in favor of Williamson County and officials Steve McMahan and Betsy Adgent.  We affirm.

## I.  BACKGROUND

Plaintiff J.H., a minor, suffers from Pediatric Autoimmune Neuropsychiatric Disorder Associated with Streptococcal Infections ("PANDAS").  According to his doctor, PANDAS often manifests itself in multiple psychiatric symptoms, such as an abrupt onset of Obsessive-Compulsive Disorder ("OCD"), impulsivity, eating disorders, depression, dysgraphia, and problems with sleep.  J.H.'s mother, Betty Harris ("Harris"), avers that J.H. began exhibiting extreme behaviors in April 2013, after exposure to strep bacteria from a housekeeper caused his PANDAS diagnosis to flare up.  And beginning in May 2013, J.H. had a series of run-ins with Tennessee's Williamson County Juvenile Court and its Juvenile Detention Center.

In October 2013, J.H. traveled to Maryland to receive intravenous immunoglobulin therapy ("IVIG")—a treatment that reboots a patient's immune system—from a pediatric neurologist, Dr. Elizabeth Latimer, who specializes in treating children with PANDAS.  According to Dr. Latimer, it usually takes four to six months for a child with PANDAS to start improving after receiving IVIG treatment.  During this time, she recommends that patients, like

J.H., remain in a center that specializes in treating children with neuropsychiatric illnesses and behavioral challenges.

Two days after his treatment in Maryland, J.H. was placed in Williamson County's Juvenile Detention Center ("JDC") after allegedly taking and crashing his mother's car. He was kept in JDC's dormitory section from October 13 to October 25, 2013, without incident. While J.H. was detained, Harris continued to seek an inpatient center for J.H.'s PANDAS treatment, as Dr. Latimer recommended.

On October 17, 2013, J.H., through counsel, petitioned the juvenile court to be furloughed into his mother's care so that he could receive treatment for his PANDAS at a neurological treatment facility. The court accepted the petition and released J.H. on furlough on October 25. But when the court discovered, in November 2013, that J.H. had not entered the facility because of an insurance dispute, it ordered that J.H. be returned to JDC. At all times that follow, J.H. was a 14-year-old pretrial detainee.

On November 17, 2013, two days after J.H. returned to JDC, three juveniles alleged that J.H. had become angry, destroyed property, punched a window, and verbally threatened them with sexual assault if they reported his conduct. After the alleged incident, one of the juveniles recanted his statement and instead claimed that the story was fabricated in order to get J.H. removed from the dormitory. The other two juveniles did not recant.

Because of the allegations, JDC officials moved J.H. from the dormitory to a single cell on November 17, 2013, where he remained until December 19, 2013. On November 17, JDC officials filled out a Detention Center Incident Report, which detailed the allegations against J.H and stated that the "Action Taken" in response to the incident was that J.H. "was moved to a single cell." While JDC's written policy provides that a juvenile charged with a facility violation resulting in segregation is entitled to a hearing before the Disciplinary Committee, JDC officials did not provide J.H. with a disciplinary hearing.

During J.H.'s segregation from November 17 to December 19, 2013, JDC officials housed him in an eleven-by-seven-foot cell. The officials did not allow J.H. to interact with any other juveniles. They initially allowed J.H. short daily visits with his parents (approximately 30

minutes), until November 21, 2013, when the officials limited J.H.'s visits with his mother to 30 minutes per week. JDC officials allowed J.H. limited time in the "rec yard"—an area of approximately 24-by-24 feet surrounded by concrete walls, razor wire above, and a single basketball hoop—and in the T.V. room, at their discretion. But time both in the rec yard and the T.V. room were spent alone. J.H. alleges that, during his time in segregation, his mental health deteriorated.

On December 7, 2013, J.H. asked JDC detention monitor Juan Cruz if he could clean around the facility rather than stay in his cell. Cruz agreed. While J.H. was cleaning, Cruz allegedly followed J.H. into a closet, where there were no security cameras, and sexually assaulted J.H. J.H. reported the assault to another JDC official. JDC suspended Cruz pending investigation of the sexual assault and ultimately terminated him when prosecutors filed criminal charges against him related to the incident with J.H.

At a hearing in juvenile court on December 9, 2013, Judge Sharon Guffee ruled upon J.H.'s parents' request to alter J.H.'s terms of confinement. Judge Guffee held that J.H. should remain in segregated detention because J.H. did not "get along with the boys in his dormitory cell" and to prevent J.H. from discussing Cruz's alleged sexual assault with others in such a way that might negatively impact the ongoing investigation.

During J.H.'s time at JDC, he was treated by multiple medical professionals in relation to his PANDAS diagnosis: he had an appointment with his psychiatrist, received an examination by JDC's nurse, and received medication from his pediatric neurologist. None of these officials requested that JDC make any accommodations for J.H.'s medical needs. On December 19, 2013, J.H. was released from detention—and his segregated cell—into the custody of his father.

About a year after his release, J.H., by and through his mother, Betty Harris, filed a lawsuit against Williamson County, Detention Monitor Juan Cruz, Juvenile Detention Center Supervisor Steve McMahan, Director of Juvenile Services Betsy Adgent, and Judge Sharon Guffee. The lawsuit, brought under 42 U.S.C. § 1983, alleged in relevant part that the defendants violated his Fourteenth Amendment rights in relation to J.H.'s allegations of solitary confinement, failure to provide adequate medical and mental health services, and sexual assault.

On May 22, 2017, the district court issued a partial summary judgment order in favor of Williamson County, Judge Guffee, Adgent, and McMahan. In analyzing the defendants' motions, the district court divided J.H.'s time in solitary confinement into two periods: (1) J.H.'s detention from November 17 to December 8, 2013, before any court had ordered that J.H. be placed in segregation; and (2) his detention from December 9 to December 19, 2013, following Judge Guffee's order that J.H. remain in segregation. Regarding the second period of confinement, the court found that Judge Guffee was entitled to absolute immunity for J.H.'s placement in segregation after her order, and Adgent and McMahan were eligible for quasi-judicial immunity for their role in J.H.'s housing after December 9 because they were required to comply with Judge Guffee's court order.

The district court issued another summary judgment ruling on July 5, 2018, after both J.H. and the defendants had filed summary judgment motions. In this order, the court granted McMahan, Adgent, and Williamson County's motions for summary judgment as to the first period of solitary confinement as well. It found that a claim against Adgent could not succeed because "Plaintiff had conceded [she] was not responsible for housing and classification decisions." (Summ. J. Order, R. 384, PageID 13253.) The court further held that solitary-confinement-related claims against McMahan and Williamson County could not proceed because J.H. had not shown "that it was clearly established in 2013 that placing a juvenile detainee in a single cell would violate his constitutional right," which was required to overcome qualified immunity and to sustain a failure-to-train *Monell* claim against a municipality. (*Id.* at 13253–58.) Additionally, although J.H. argued in his motion for summary judgment that he had been placed in solitary confinement without due process, the court granted the defendants' motion as to this claim because J.H. failed to plead any procedural due process claim in his complaint.

The court also granted Adgent and McMahan's motions for summary judgment on J.H.'s claims for failure to provide medical and mental health care. While the court agreed that J.H.'s severe mental health issues had been documented, it nonetheless found that because none of J.H.'s mental health care providers requested special accommodations for him, J.H. was unable to show that the care provided to him during his detention at JDC was grossly inadequate.

Finally, the court addressed the claims relating to the alleged sexual assault.  The court found that genuine disputes of material fact existed on J.H.'s claim against Cruz and permitted that claim to go forward.  But it granted the remaining defendants' motions for summary judgment on J.H.'s claims related to the assault.  The court held that the claims against Adgent and McMahan for failure to train and supervise Cruz were in their official capacities only, and thus these claims were redundant of the claim against the county; and J.H. could not succeed on his claim against Williamson County, as he had failed to show that the county knew of any substantial risk of Cruz sexually assaulting J.H.

The district court then granted J.H.'s motion to deem judgment final as to Williamson County, McMahan, and Adgent pursuant to Federal Rule of Civil Procedure 54(b), allowing J.H. to appeal while proceedings for the remaining claim against Cruz are stayed.  J.H. timely appealed.

The following decisions by the district court are now before us: (1) the district court's grant of summary judgment for McMahan and Williamson County on J.H.'s claim that they violated J.H.'s Fourteenth Amendment rights by placing him in solitary confinement from November 17 to December 8, 2013, the period before Judge Guffee's order; (2) the district court's grant of summary judgment for Williamson County on J.H.'s claim of being placed in solitary confinement from December 9 to 19, 2013, the period following Judge Guffee's order; (3) the district court's dismissal of J.H.'s procedural due process claim; (4) the district court's grant of summary judgment for Adgent and McMahan on J.H.'s denial of health care claim; and (5) the district court's grant of summary judgment for Williamson County on J.H.'s claim that the county was deliberately indifferent to the substantial risk of harm from Cruz.

## II. ANALYSIS

### A.    Standard of Review

On appeal, we review the "grant of summary judgment de novo."  *Hanover Ins. Co. v. American Eng'g Co.*, 33 F.3d 727, 730 (6th Cir. 1994).  Summary judgment is appropriate when "there is no genuine dispute as to any material fact," thereby allowing the court to decide that the moving party "is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A genuine

dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Peffer v. Stephens*, 880 F.3d 256, 262 (6th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

### B.      Solitary Confinement Claims

On appeal, J.H. challenges the district court's grant of summary judgment in favor of McMahan for the period of solitary confinement prior to December 9, and its grant of summary judgment in favor of Williamson County for the entire period of solitary confinement—November 17 to December 19.  J.H. also argues that his procedural due process claim was properly pleaded.  We address each argument in turn below.

### 1.      Fourteenth Amendment Substantive Due Process Claim Against McMahan for Solitary Confinement from November 17 to December 8, 2013

The district court held that J.H. had sufficiently alleged McMahan's personal involvement in J.H.'s solitary confinement, but disposed of J.H.'s Fourteenth Amendment claim against McMahan on grounds of qualified immunity.  "Determinations of qualified immunity require us to answer two questions: first, whether the officer violated a constitutional right; and second, whether that right was clearly established in light of the specific context of the case." *Hayden v. Green*, 640 F.3d 150, 153 (6th Cir. 2011).  Because we can answer the qualified immunity questions in any order, *see Pearson v. Callahan*, 555 U.S. 223, 236 (2009), we begin with the question of whether McMahan violated a constitutional right and then turn to whether that right was clearly established.

### i.      *Violation of a Constitutional Right*

J.H. has alleged that JDC officials, acting at McMahan's direction, kept him in solitary confinement as punishment for the November 17 incident, and that while in segregation he was fully isolated.  Under the first prong of our qualified immunity analysis, we ask "whether [J.H.]'s

allegations, *if true*, establish a constitutional violation." *Hope v. Pelzer*, 536 U.S. 730, 736 (2002) (emphasis added).[1]

The Supreme Court established in *Bell v. Wolfish* that, under the due process clause, "a detainee may not be punished prior to an adjudication of guilt." 441 U.S. 520, 535 (1979). Under *Bell*, a pretrial detainee can demonstrate that he was subjected to unconstitutional punishment in either of two ways: (1) by showing "an expressed intent to punish on the part of the detention facility officials," or (2) by showing that a restriction or condition is not rationally related to a legitimate government objective or is excessive in relation to that purpose. *Id.* at 538–39; *see also Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015).

The "expressed intent to punish" prong proscribes an intent to punish for the alleged crime causing incarceration prior to an adjudication of guilt. *See Bell*, 441 U.S. at 535. It also prohibits officials from subjectively seeking to punish detainees simply because they are detainees, *see id.* at 539, or on the basis of vengeful or other illegitimate interests, *see Bistrian v. Levi*, 696 F.3d 352, 375 (3d Cir. 2012) (holding the plaintiff had sufficiently alleged a substantive due process violation under the "expressed intent to punish" prong where placement of the plaintiff in solitary confinement was allegedly a vindictive response to a challenge brought by the plaintiff's lawyer). This prong does not, however, categorically prohibit discipline imposed by jail officials for infractions committed while in pretrial detention. *See, e.g.*, *Rapier v. Harris*, 172 F.3d 999, 1002–03 (7th Cir. 1999); *Kanu v. Lindsey*, 739 F. App'x 111, 116 (3d Cir. 2018); *Stamper v. Campbell Cnty.*, 415 F. App'x 678, 678–81 (6th Cir. 2011). Here, J.H. alleges that he was placed in solitary confinement in direct response to the November 17 disciplinary incident. This alleged action, without more, does not run afoul of the first prong of *Bell*.

The relevant question is thus under *Bell*'s second prong: whether J.H.'s placement in segregation was "rationally related to a legitimate nonpunitive governmental purpose and

---

[1]The district court held that there were genuine disputes of material fact as to these allegations by J.H., particularly "whether J.H. was placed in a single cell as punishment" and "how much social interaction J.H. had while housed in the single cell." (Summ. J. Order, R. 384, PageID 13251–52.) In assessing the first prong of the qualified immunity analysis, we do not disturb the district court's determination on these factual points. Instead, we ask whether J.H. can show a constitutional violation if his allegations were true. *See Hope*, 536 U.S. at 736.

whether [it] appear[s] excessive in relation to that purpose." *Bell*, 441 U.S. at 561; *see also Collazo-Leon v. U.S. Bureau of Prisons*, 51 F.3d 315, 318 (1st Cir. 1995). In answering the first part of this question, we agree that McMahan has put forth a legitimate governmental purpose: "maintain[ing] safety and security in the facility." (McMahan Br. 42.) As the Supreme Court explained in *Bell*, "maintaining institutional security and preserving internal order and discipline are essential goals" of a detention facility. 441 U.S. at 546. Temporary placement of J.H. in solitary confinement, given his accused disciplinary infraction, appears rationally related to this purpose.

Yet where McMahan's argument falters is on the question of whether the discipline here was excessive. *See Williamson v. Stirling,* 912 F.3d 154, 176 n.18 (4th Cir. 2018) (explaining "disciplinary measures based on a pretrial detainee's misconduct in custody" must be "proportional thereto" in order to avoid qualifying as unconstitutional "'punishment' within the meaning of *Bell*"); *see also Collazo-Leon*, 51 F.3d at 318; *Bistrian*, 696 F.3d at 374. Jail administrators are afforded "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell*, 441 U.S. at 547. Yet this deference has its limits, and does not permit a detention facility to impose conditions that are excessively "harsh . . . to achieve objectives that could be accomplished [with] . . . alternative and less harsh methods." *Id.* at 539 n.20.

In considering whether the discipline imposed on J.H. was excessive, we are mindful of J.H.'s age; his known mental health issues; and the duration and nature of his confinement. We weigh these factors against the disciplinary infraction of which J.H. was accused and the governmental purpose for which the discipline was imposed. When considering "the totality of [these] circumstances," we conclude that the discipline imposed was excessive relative to its purpose and thus violated J.H.'s Fourteenth Amendment rights as described in *Bell*. *See Hubbard v. Taylor*, 399 F.3d 150, 159–60 (3d Cir. 2005).

First, we must consider that J.H. was a 14-year-old juvenile. As the Supreme Court has described, "youth is . . . a moment and 'condition of life when a person may be most susceptible to influence and to psychological damage.'" *Miller v. Alabama*, 567 U.S. 460, 476 (2012)

(quoting *Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982)).  A growing chorus of courts have recognized the unique harms that are inflicted on juveniles when they are placed in solitary confinement.  *See*, *e.g.*, *Doe by and through Frazier v. Hommrich*, No. 3-16-0799, 2017 WL 1091864, at *2 (M.D. Tenn. Mar. 22, 2017) (granting a preliminary injunction preventing a detention facility from placing juveniles in solitary confinement as punishment or discipline and describing how "courts around the country have found increased protections for juveniles and persons with diminished capacities from inhumane treatment under the Eighth and Fourteenth Amendments"); *V.W. by and through Williams v. Conway*, 236 F. Supp. 3d 554, 583, 590 (N.D.N.Y. 2017) (issuing a preliminary injunction to enjoin a county and its officials "from imposing 23-hour disciplinary isolation on juveniles" and recognizing "there is a broad consensus among the scientific and professional community that juveniles are psychologically more vulnerable than adults"); *Turner v. Palmer*, 84 F. Supp. 3d 880, 884 (S.D. Iowa 2015) (denying qualified immunity to officials who placed a juvenile with psychiatric issues in solitary confinement and noting that "[t]raditionally, juvenile detainees are afforded greater constitutional protection").  As a 14-year-old, J.H. was uniquely vulnerable to the harmful effects of solitary confinement, and thus his placement in segregation was a particularly harsh form of discipline.

Second, it was well-known to McMahan before placing J.H. in solitary confinement that J.H. had been diagnosed with and required treatment for PANDAS, which is associated with several psychiatric symptoms.  Placement of a mentally-ill detainee in solitary confinement "raises a genuine concern that the negative psychological effects of his segregation will drive him to self-harm." *Wallace v. Baldwin*, 895 F.3d 481, 485 (7th Cir. 2018).  As the Third Circuit has explained, confinement of a detainee should be assessed "in light of his mental illness," recognizing the "growing consensus" that solitary confinement "can cause severe and traumatic psychological damage, including anxiety, panic, paranoia, depression, post-traumatic stress disorder, psychosis, and even a disintegration of the basic sense of self identity." *Palakovic v. Wetzel*, 854 F.3d 209, 225 (3d Cir. 2017).  Here, J.H.'s documented mental health issues made him particularly vulnerable to the effects of solitary confinement.

Third, we are mindful of the nature and duration of J.H.'s segregation. *See Williamson*, 912 F.3d at 180 ("[T]he *Bell* Court expressly considered, inter alia, the duration of the punitive conditions.") (citing *Bell*, 441 U.S. at 543); *Bistrian*, 696 F.3d at 374 (considering the "nature of [the pretrial detainee's] confinement" in determining whether the disciplinary segregation was excessive). J.H was in solitary confinement for several weeks—from November 17 to December 8, 2013—before Judge Guffee ruled on his placement in segregation. J.H. was housed in an eleven-by-seven-foot cell where he was not allowed to interact with any other juveniles. These 21 days of isolation are of noteworthy duration, as "[t]here is not a single study of solitary confinement wherein non-voluntary confinement that lasted for longer than 10 days failed to result in negative psychological effects." *Williams v. Sec'y Pa. Dep't of Corrs.*, 848 F.3d 549, 566 (3d Cir. 2017) (quoting Craig Haney & Mona Lynch, *Regulating Prisons of the Future: A Psychological Analysis of Supermax and Solitary Confinement*, 23 N.Y.U. Rev. L. & Soc. Change 477, 531 (1997)). The Third Circuit noted a study showing that "even a few days of solitary confinement will predictably shift the electroencephalogram (EEG) pattern toward an abnormal pattern characteristic of stupor and delirium." *Id.* at 567 (quoting Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U. J.L. & Pol'y 325, 331 (2006)). And as Justice Kennedy has described, it has "long . . . been understood" that there is a "human toll wrought by extended terms of isolation." *Davis v. Ayala*, 135 S. Ct. 2187, 2209 (2015) (Kennedy, J., concurring).

In sum, considering J.H.'s age, mental health, and the duration and nature of his confinement, we conclude that the punishment imposed on J.H. was excessive. When weighing the penalty imposed against his disciplinary infraction—in which he made verbal threats but did not physically injure another detainee—it is apparent that his punishment was disproportionate in light of the stated purpose of maintaining institutional security. *See Williamson*, 912 F.3d at 179–81 (holding a reasonable factfinder could conclude a detainee's lengthy placement in solitary confinement "because of a single incident of unrealized and unrepeated threats" was excessive). Any momentary need to separate J.H. from the specific detainees whom he had threatened on November 17 does not justify the extended duration in which McMahan subjected J.H. to solitary confinement and completely isolated him from all contact with other juveniles. This discipline was excessive given the infraction that J.H. was accused of and the unique

vulnerabilities he possessed—namely his age and mental health status.[2]  We therefore hold that, assuming J.H.'s allegations to be true, his Fourteenth Amendment substantive due process rights were held in solitary confinement from November 17 to December 8, 2013.

### ii.    *Clearly Established Right*

The second question is whether the constitutional right in question was clearly established at the time of the alleged violation.  In order for the right to be clearly established, "[then-]existing precedent must have placed the . . . constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011); *see also Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018).

We cannot say that the right at issue was established with sufficient specificity as to hold it clearly established as of 2013, the time of these incidents.  Many of the cases recognizing what a punishing experience placement in solitary confinement can be—especially for juveniles and those with mental health issues—have been issued after 2013.

Thus, McMahan is entitled to qualified immunity, and we are obliged to affirm the district court's grant of summary judgment on this claim.

### 2.    Fourteenth Amendment Substantive Due Process Claim against Williamson County for Solitary Confinement from November 17 to December 8, 2013

J.H. also sued Williamson County, arguing that its policies and customs were the "moving force" for the "constitutional violations perpetrated against" J.H. and that the county

---

[2]We do not mean to imply that each of these factors—that is, a detainee being a juvenile and mentally ill— must be present for the imposition of solitary confinement to be unconstitutionally excessive under *Bell*.  *See, e.g.*, *Williamson*, 912 F.3d at 181 (holding that simply the length of the plaintiff pretrial detainee's solitary confinement could lead a "reasonable factfinder [to] conclude" that it was "excessive relative to his infractions"); *Bistrian*, 696 F.3d at 374 (concluding that given the "nature of [the plaintiff's] confinement" it could be deemed excessive). However, where these factors are present, they must be relevant to our analysis.  A court cannot consider the punishment of a child while ignoring the fact that he is a child, nor can a court pretend that the effects of solitary confinement are the same regardless of a detainee's mental health status.  *See Miller*, 567 U.S. at 474 (explaining that "imposition" of "penalties on juvenile offenders cannot proceed as though they were not children"); *Palakovic*, 854 F.3d at 225–26 (reversing a district court's dismissal of an Eighth Amendment claim brought on behalf of a mentally ill 23-year-old who was placed in solitary confinement where plaintiffs had sufficiently alleged the "conditions there were inhumane for him in light of his mental illness").

was deliberately indifferent "in the supervision and training of juvenile detention personnel." (Compl., R. 1, PageID 3.)  Although "[m]unicipalities are not vicariously liable for the actions of their employees" under 42 U.S.C. § 1983, *Bible Believers v. Wayne County*, 805 F.3d 228, 260 (6th Cir. 2015) (en banc), a plaintiff can establish municipal liability under § 1983 by showing he was injured pursuant to a municipality's custom or policy, *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 694 (1978).

One basis for a *Monell* claim is a municipality or county's failure to train its employees. As the Supreme Court concluded in *City of Canton v. Harris*, 489 U.S. 378 (1989):

> [I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.  In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

*Id.* at 390.  In *Shadrick v. Hopkins County*, 805 F.3d 724 (6th Cir. 2015), we held that plaintiffs can establish liability under a failure-to-train theory based on "'a single violation of federal rights, accompanied by a showing that [the county] has failed to train its employees to handle recurring situations presenting an obvious potential' for a constitutional violation." *Id.* at 738–39 (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997)).  "'[O]bvious potential for such a violation' has two elements:  It must be obvious that the failure to train will lead to certain conduct, *and* it must be obvious (*i.e.*, clearly established) that the conduct will violate constitutional rights." *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 995 (6th Cir. 2017).  "The absence of a clearly established right spells the end of [a plaintiff's] *Monell* claim." *Id*.

J.H. argues it was obvious that Williamson County's failure to train its employees on the classification and housing of juveniles would lead to unconstitutional uses of "punitive solitary confinement for pre-trial detainee juveniles." (Appellant Br. 41.)  Furthermore, he argues it was obvious (or clearly established) that such punitive uses of solitary confinement would be unconstitutional.  Having already concluded that J.H.'s substantive due process right was not

clearly established as of 2013, we must also conclude that J.H.'s *Monell* claim against Williamson County cannot succeed. *See Arrington-Bey*, 858 F.3d at 995.

We thus affirm the district court on this claim.

### 3.    Fourteenth Amendment Substantive Due Process Claim Against Williamson County for Solitary Confinement from December 9 to December 19, 2013

J.H. also appeals the district court's grant of summary judgment for Williamson County on the claim relating to his solitary confinement after Judge Guffee ordered on December 9 that J.H. remain in segregation. J.H. argues that neither Guffee's judicial immunity nor McMahan's quasi-judicial immunity extends to a municipality. *See Monell*, 436 U.S. at 701 ("[M]unicipal bodies sued under § 1983 cannot be entitled to an absolute immunity, lest our decision that such bodies are subject to suit under § 1983 'be drained of meaning.'") (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 248 (1974)).

Williamson County does not contend that it is eligible for judicial or quasi-judicial immunity—rather, it correctly argues that no basis for municipal liability remains after the court order on December 9, 2013, because Judge Guffee is not a policymaker whose decisions can create municipal liability. This conforms with our precedent. We have held that the "alleged unconstitutional actions taken by a juvenile court judge are not 'policies' of the county for which liability could attach under *Monell*"; instead, Judge Guffee's order that J.H. remain in segregation was a "judicial decision[]" that was only "reviewable on appeal to the Tennessee appellate courts." *Johnson v. Turner*, 125 F.3d 324, 335–36 (6th Cir. 1997). Nor could Adgent's or McMahan's adherence to that order create municipal liability because neither retained final policymaking authority regarding whether to segregate J.H. after the order was issued. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986).

We therefore affirm the district court on this claim.

**4.** **Fourteenth Amendment Procedural Due Process Claim Against McMahan and Williamson County**

J.H. next argues that the district court erroneously dismissed his procedural due process claim against McMahan and Williamson County on the basis that it was not properly pleaded. The defendants argue that allowing J.H. to pursue a procedural due process claim not found in J.H.'s complaint would prejudice them because it would "subject [them] to unfair surprise." (Williamson Cnty. Br. 40.)

"The Federal Rules of Civil Procedure . . . provide for liberal notice pleading at the outset of the litigation." *Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005). Accordingly, even if a new claim appears during discovery, "liberal amendment of the complaint is provided for by Rule 15(a) of the Federal Rules of Civil Procedure, which states that leave to amend the complaint 'shall be freely given when justice so requires.'" *Id.* But "[o]nce a case has progressed to the summary judgment stage," as is true here, "the liberal pleading standards under . . . [the Federal Rules] are inapplicable." *Id.* (quoting *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004)).

J.H.'s complaint alleges that the decision to put him in segregation "occurred in violation of [the Prison Rape Elimination Act (PREA)] and Tennessee Department of Corrections minimum requirements of confinement." (Compl., R. 1, PageID 7–8.) It is unclear from the complaint, however, which portions of the PREA and the Tennessee Department of Corrections minimum requirements of confinement that J.H. alleges were violated. And even though J.H.'s complaint alleges violations of the Fourteenth Amendment, there are no specific allegations of procedural deficiencies.

Thus, we affirm the district court's holding that J.H. did not properly plead a procedural due process claim.

**C.** **Failure to Provide Medical and Mental Health Care Claims Against Adgent and McMahan**

J.H. also argues that Adgent and McMahan failed to provide adequate medical and mental health care and were deliberately indifferent to his serious medical needs. Specifically,

he alleges that "there was ample evidence to put Adgent and McMahan on notice of [the fact] that J.H. was suffering from serious mental health issues when he arrived at detention." (Appellant Br. 52.)  J.H. further alleges that "Adgent and McMahan ignored the needs of J.H. with ample evidence in front of them that he was a child suffering from mental deterioration" while in their care.  (*Id.* at 53.)[3]

To prove deliberate indifference to his serious medical needs, J.H. must "demonstrate both:  (1) the existence of a 'sufficiently serious' medical need; and (2) that defendants 'perceived facts from which to infer substantial risk to the prisoner, that [they] did in fact draw the inference, and that [they] then disregarded that risk.'"  *Hopper v. Plummer*, 887 F.3d 744, 756 (6th Cir. 2018) (quoting *Comstock v. McCrary*, 273 F.3d 693, 702–03 (6th Cir. 2001)).

The district court found that "it was reasonable for Adgent and McMahan to follow the instructions of medical providers concerning J.H.'s medication and to believe that any additional counseling or mental health treatment would be set up by J.H.'s parents or guardian ad litem or ordered by his medical providers."  (Summ. J. Order, R. 384, PageID 13262.)  We agree.  It is undisputed that J.H. met with and received medication from multiple medical professionals during his time at JDC, and that none of these officials requested that JDC make any accommodations for J.H.'s medical needs.  Thus, the defendants' actions were taken in reasonable "rel[iance] on medical judgments made by medical professionals responsible for prisoner care."  *Graham ex rel. Estate of Graham v. Cnty. of Washtenaw*, 358 F.3d 377, 384 (6th Cir. 2004) (quoting *Ronayne v. Ficano*, No. 98–1135, 1999 WL 183479, at *3 (6th Cir. Mar. 15, 1999)).

We therefore affirm the district court on this claim.

---

[3]We do not read J.H.'s brief on appeal as also raising a claim against Williamson County for failure to provide medical care, nor has he provided a basis for why there would be *Monell* liability here.  Thus, we need not address the arguments raised in Williamson County's brief averring that J.H. cannot succeed on such a claim against the county.

**D.      Failure to Train and Supervise Cruz Claim Against Williamson County**

Finally, J.H. alleges that Williamson County was deliberately indifferent to the substantial risk that Cruz would sexually assault him, and that it failed to supervise and train Cruz.**[4]**  In order to establish municipal liability under an "inaction" theory, as J.H. alleges, he must show: (1) "the existence of a clear and persistent pattern of sexual abuse by [JDC] employees; (2) notice or constructive notice on the part of [Williamson County]; (3) [Williamson County]'s tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and (4) that [Williamson County] was the 'moving force' or direct causal link in the constitutional deprivation." *Doe v. Claiborne Cnty.*, 103 F.3d 495, 508 (6th Cir. 1996).  According to J.H., Williamson County was deliberately indifferent to the risk that Cruz would sexually assault J.H. when it failed to properly train him and properly conduct a background check, which would have revealed that Cruz is bisexual.

While the details of Cruz's alleged assault on J.H. are troubling, J.H. has not met his burden to establish municipal liability.  We have held in unpublished cases that "opportunity alone, without reason to suspect that it will lead to a constitutional violation, does not establish deliberate indifference." *Mize v. Tedford*, 375 F. App'x 497, 501 (6th Cir. 2010); *see also Doe v. Magoffin Cnty. Fiscal Ct.*, 174 F. App'x 962, 970 (6th Cir. 2006).  There was no clear pattern of sexual abuse at JDC, and Cruz had no history of misconduct at JDC.  And there is no authority to support the offensive claim that a sexual assault is the obvious consequence of an official's sexual orientation.  J.H. argues that *Mize* and *Magoffin* are inapposite because, in those cases, the defendants were not charged with assuming responsibility of the plaintiffs in the way that Cruz's job required.  But that does not change the fact that "[t]he intentional, violent act that" Cruz is

---

**[4]**J.H.'s brief, in passing, also asks this court to hold that a reasonable jury could find Adgent and McMahan were "individually" deliberately indifferent to the substantial risk posed by Cruz. (*See* Appellant Br. 72.)  We need not address the merits of this claim.  The district court held that "there are no claims for failure to train and supervise against Adgent and McMahan individually," as "Plaintiff has agreed" that these claims are only alleged against Adgent and McMahan in their official capacity. (Summ. J. Order, R. 384, PageID 13264.)  The district court correctly dismissed these official capacity claims as superfluous of the claim against the county. *See Foster v. Michigan*, 573 F. App'x 377, 390 (6th Cir. 2014) ("Where the entity is named as a defendant, an official-capacity claim is redundant.").  J.H. cannot raise new individual-capacity claims, which he previously agreed he was not asserting, in his appellate brief.

alleged to have "performed far outside the scope of his duties" was not "something that was 'obvious' to occur." *Magoffin Cnty. Fiscal Ct.*, 174 F. App'x at 970. Furthermore, J.H. has not shown a "direct causal connection" between the failure to train Cruz and his alleged assault of J.H.—in other words, it is far from clear that any lack of training was the "moving force" behind Cruz's decision to sexually assault a child. *Claiborne Cnty.*, 103 F.3d at 508–09.

Thus, we affirm the district court on this claim.

### III.  CONCLUSION

For the foregoing reasons, we affirm the district court's grant of summary judgment to defendants Williamson County, Steve McMahan, and Betsy Adgent.

---

**CONCURRING IN PART AND IN THE JUDGMENT**

---

CHAD A. READLER, Circuit Judge, concurring in part, and in the judgment.  The public employees operating the Williamson County Juvenile Detention Center faced a dilemma.  Responsible for the care of up to a dozen minors, those officials had under their supervision one minor, J.H., who, due to mental health concerns, was a threat to himself and others.  To remedy the situation and protect the juvenile detainee population, the facility for a time housed J.H. away from other detainees, in a single cell.  A state juvenile court judge approved that arrangement and ordered that it continue for an additional period to allow for further evaluation of J.H.

I concur with much of the majority opinion, including its holding that the conduct of these public safety officials did not violate a clearly established constitutional right.  But I respectfully disagree with the majority's assessment that the conduct nonetheless ran afoul of substantive due process principles.  In reaching that conclusion, the majority tailors its analysis to the unique facts before us:  the multi-week confinement of a fourteen-year-old suffering from mental illness, one so severe that it is "associated with several psychiatric symptoms."  A heartbreaking episode, we all agree, for both J.H. and his family.

As this case aptly demonstrates, however, ensuring safety in a detention facility sometimes requires difficult decisions.  Put yourself in the shoes of these public servants.  Their duties, never easy in the best of times, were made especially challenging by reports of J.H.'s threatening behavior.  The officials moved J.H. away from others to ensure safety and to avoid a potential confrontation.  Any other response would have allowed J.H. to remain a threat to his dorm mates, other juveniles, facility staff, and indeed himself.

1.  To the majority, these efforts constituted impermissible punishment, in violation of the substantive due process principles described in *Bell v. Wolfish*, 441 U.S. 520 (1979).  As I will explain later, I do not agree that the restrictions on J.H. amounted to impermissible punishment under *Bell*.  But we need not even reach that question, for it is doubtful *Bell* was intended to apply in the context of an official's effort to remedy misconduct committed while in custody.

*Bell*, all acknowledge, places limits on pretrial punishment for acts committed *before* one is detained. Punishing a detainee simply for the alleged criminal conduct that led to his detention, after all, would impermissibly put the retributory cart before the adjudicatory horse, invoking constitutional considerations. *See id.* at 535–36. Yet whether the standard "condition[s] of confinement" applicable to all pre-trial detainees housed in a specific facility are so restrictive as to constitute punishment for pre-incarceration conduct is all that *Bell* addressed. *Id.* at 531. The case says nothing about the measures officials may take to address an individual's rules violations *while in custody*, for which some measure of punishment may be appropriate. *See id.* at 536–37 (assessing whether certain restraints were appropriate and justified for the general purpose of ensuring a detainee's presence at trial for the charges leading to detention).

The majority seemingly acknowledges as much. It notes that *Bell* "proscribes an intent to punish for the *alleged crime causing incarceration* prior to an adjudication of guilt." And it observes that *Bell* does not "categorically prohibit discipline imposed by jail officials for infractions committed while in pretrial detention." But the majority then ties these notable limitations only to *Bell*'s first prong, not its second. All agree that *Bell*'s first prong addresses instances where impermissible intent to punish can be derived from an "expressed intent," whereas *Bell*'s second prong addresses whether, in the absence of an express indication, a restriction's illegitimacy or irrationality indicates it is in fact a form of impermissible punishment. *Bell*'s two prongs are thus complimentary means for measuring whether the restriction in question was imposed with an intent to "punish for the *alleged crime causing incarceration* prior to an adjudication of guilt." *See Graham v. Connor*, 490 U.S. 386, 398 (1989) (noting that use of the word "punishments" clearly suggests an inquiry into subjective motivations). *Bell*'s second prong does not independently guide officials in how they remedy in-custody misconduct, with the first prong governing pre-incarceration conduct. Rather, both prongs measure the permissibility of the restriction in question only against "the alleged crime causing incarceration." *Bell* simply did not consider scenarios where the purported punishment was imposed based upon the detainee's misconduct while detained. *See, e.g., Collazo-Leon v. U.S. Bureau of Prisons*, 51 F.3d 315, 317–18 (1st Cir. 1995) (noting that *Bell* did not deal with punishment of in-custody conduct and that *Bell*'s second prong looks to "an intent to punish the detainee for prior unproven criminal conduct").

That is not to say J.H. has no constitutional means available for testing the restrictions placed upon him for his in-custody misconduct. He enjoys procedural due process rights that would apply if he were punished, *see Martucci v. Johnson*, 944 F.2d 291, 294–95 (6th Cir. 1991), although the majority rightly concludes that no such violation was sufficiently alleged here. Pretrial detainees more generally may enjoy other well-defined substantive rights in this context as well. *See, e.g.*, *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015) (excessive force); *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239 (1983) (inadequate medical care); *Farmer v. Brennan*, 511 U.S. 825 (1994) (deliberate indifference); *see also Richko v. Wayne County*, 819 F.3d 907, 915 (6th Cir. 2016) (noting that "pretrial detainees are entitled to the same Eighth Amendment rights as other inmates" (quoting *Thompson v. County of Medina*, 29 F.3d 238, 242 (6th Cir. 1994))). And in the rare case where the punishment for in-custody conduct is so severe that it clearly was inspired not by in-custody misconduct, but instead by the crime that led to incarceration, *Bell* may provide relief if the means used are excessive to a legitimate purpose. *See* 441 U.S. at 538–39. But, it bears repeating, in generally limiting what a facility may do for the broad purpose of ensuring a detainee's presence at trial, *Bell*'s prohibition on punishing pretrial detainees for pre-incarceration conduct says nothing about the limits placed on public officials who are responding to a disobedient, threatening detainee. *See, e.g.*, *Ford v. Bender*, 768 F.3d 15, 24–25 (1st. Cir. 2014) (noting that the court's inquiry does not end upon finding punishment of a pretrial detainee for in-custody misconduct, because "*Bell* was not written to address a 'situation where discrete sanctions were imposed on individual pretrial detainees as discipline for specific in-house violations'" (quoting *Collazo-Leon*, 51 F.3d at 317)).

2. Even if one were to accept the majority's expansive reading of *Bell*'s second prong, substantive due process does not tie the hands of public officials in weighing the many considerations before them as they resolve a difficult episode. As *Bell* reminds us, the "central objective of prison administration" is "safeguarding institutional security." 441 U.S. at 547 (citations omitted). In view of that "central objective," we routinely approve of restrictions employed to curtail detainee misconduct and support institutional security. *Id.* (explaining that this "central objective" may require limits even on detainees' "specific constitutional guarantee[s]").

Adopting the majority's reading of *Bell*, to establish impermissible punishment, J.H. must show either that there was no legitimate, nonpunitive purpose for the restrictions placed upon him, or that those restrictions were excessive for their assigned purpose. *Id.* at 538–39. In making that assessment, we must not forget that "the problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions," *id.* at 547, and we thus must honor detention officials' judgment over "a court's idea of how best to operate a detention facility." *Id.* at 539 (citations omitted). Mindful of the training and experience enjoyed by those officials, in matters involving the operation of a detention facility, we hold plaintiffs to a "heavy" burden. *Id.* at 561–62. "[I]n the absence of *substantial evidence* in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Id.* at 548 (quoting *Pell v. Procunier*, 417 U.S. 817, 827 (1974) (emphasis added)); *see also T.S. v. Doe*, 742 F.3d 632, 639 (6th Cir. 2014) (collecting cases showing that Supreme Court precedent has "emphatically reinforced the hands-off approach courts must apply").

To my eye, J.H.'s detention was not excessive to the legitimate safety interests involved. Even reading the record in the light most favorable to J.H., one is struck by the security and safety challenges faced by the public servants at the Juvenile Detention Center. Those officials were responsible for the well-being of up to a dozen minors, each of whom was placed in detention for threatening conduct of varying proportions. One of the minors, J.H., entered the facility in the midst of a behavioral and psychological crisis. Multiple petitions were filed against him in juvenile court for serious behavioral problems, including attempts to harm himself and others. He stole cars and crashed them, not once, but twice. And he had been placed in juvenile detention previously, for varying periods of time.

Unfortunately, this self-destructive behavior continued when J.H. returned to pretrial detention in November 2013. Just two days in, J.H.'s dorm mates reported disturbing conduct to facility officials: J.H. had destroyed property by ripping a mattress and a shoe, punched the window with his hand, and threatened to harm and rape his dorm mates if they reported the conduct. That behavior was consistent with observations by J.H.'s own physician, who had recommended inpatient treatment for J.H. because J.H. "continue[d] to exhibit significant

physically and verbally aggressive behaviors that [were] creating extreme safety challenges at home for him and his family." Facility staff assessed the situation, recorded the reported incident, and moved J.H. to a single cell, apart from other children. Taking all of this together, there was a legitimate basis for believing J.H. was a threat to others, and for acting accordingly, to ensure safety given the specific confines of the detention facility. No case, to my knowledge, requires facility officials to allow open hostility between detainees, threatening their safety and indeed that of the officials themselves, all in the name of substantive due process. To the contrary, we afford those officials "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell*, 441 U.S. at 547 (citing cases).

Given these legitimate safety concerns, the restrictions employed were not excessive. J.H. was placed in a single cell, away from other minors. The majority notes that J.H. "was not allowed to interact with any other juveniles." But facility officials, in achieving their prophylactic aim, took steps to limit J.H.'s isolation. J.H. had phone calls with his parents. He had regular in-person visits with his father. He had regular visits with his mother as well, until she tried to bring prescription medications into the facility without prior authorization, at which point her visits were limited to thirty minutes a week. J.H. also met with a doctor, a psychologist, his attorney, and his guardian ad litem. He conversed with the guards. He had books available in his cell, brought to him by his mother. And he was allowed to enjoy certain privileges outside of his cell, including visits to the "rec yard," exercising, watching T.V., and doing his homework in the hallway. These measures sought to minimize the chances that J.H. would harm himself, and to honor the security concerns of the other detainees, who themselves enjoy constitutional protections from deliberate indifference of their detention officials. *See, e.g.*, *Farmer*, 511 U.S. at 837 (holding officials may be liable for deliberate indifference where they are aware of, and disregard, facts informing them of a substantial risk to inmate health or safety); *see also Richko*, 819 F.3d at 918 (finding genuine dispute as to deliberate indifference where jail officials placed inmate with history of violent assault and mental illness with cellmate whom he later assaulted, rather than placing him in a single cell). That J.H., for a time, could not be around other juveniles strikes me as a reasonable "judgment call" by the detention facility, given the many respective interests at stake. *See Bell*, 441 U.S. at 562; *see also id.* at 546–47

(noting the "central . . . corrections goal[] is the institutional consideration of internal security within the corrections facilities themselves" (quoting *Pell*, 417 U.S. at 823)).

It may be, as the majority contends, that some social science cautions against the use of solitary confinement, at least for longer periods of time, perhaps for minors in particular. Of course, many restrictions employed in the detention context may well be viewed in the same cautionary light, when utilized in a reckless manner. But there was nothing reckless about how these officials balanced the interests of J.H. with those of the other detainees. And more broadly, solitary confinement as a means of remedial action remains "a useful or necessary" discretionary option available to safety officials in their efforts "to protect prison employees or other inmates." *Davis v. Ayala*, 135 S. Ct. 2187 (2015) (Kennedy, J., concurring); *see also Higgs v. Carver*, 286 F.3d 437, 438 (7th Cir. 2002) (allowing prisoner segregation as "a jail's failure to take steps to prevent harm to the prisoner or to other prisoners might give rise to meritorious suits against the jail" (citation omitted)).

Back to *Bell*. There, the Supreme Court approved of a host of detainee-related practices, including intrusive body cavity searches, 441 U.S. at 558, and emphasized the myriad steps officials operating detention facilities may take to maintain security, *id.* at 540, 547, guard against inmate fights, *id.* at 555, and maintain discipline, *id.* at 546, even if those practices are "discomforting." *Id.* at 540; *see also Blackmon v. Sutton*, 734 F.3d 1237, 1242, 1244 (10th Cir. 2013) (Gorsuch, J.) (indicating that restraint chair may be appropriate where there is a "legitimate penological purpose," such as "when the detainee bears a weapon he refuses to release or otherwise poses a grave threat to himself or others" (citations omitted)). And those practices, it bears adding, need not be the least restrictive means available to accomplish an official's security objectives. *Block v. Rutherford*, 468 U.S. 576, 589 (1984) (upholding a complete ban on contact visitation even for low-risk detainees).

Taking all of this together, a safety-based restriction must simply be legitimate and not excessive for that purpose. *See Bell,* 441 U.S. at 538–39. Where legitimate factors support the restriction, the "limited scope of the judicial inquiry" is at an end. *Block*, 468 U.S. at 589 (citing *Bell*, 441 U.S. at 554). As well intentioned as is the majority, we nonetheless may not substitute our judgment for that of detention officials.