NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0422n.06
No. 20-4329

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| MARK LLOYD, | ) | **FILED** |
| | ) | Sep 03, 2021 |
| Plaintiff-Appellant, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | |
| | ) | ON APPEAL FROM THE |
| PROCTER & GAMBLE DISABILITY BENEFIT | ) | UNITED STATES DISTRICT |
| PLAN, Plan #501; PROCTER & GAMBLE LONG | ) | COURT FOR THE |
| TERM DISABILITY ALLOWANCE POLICY | ) | SOUTHERN DISTRICT OF |
| PLAN; PROCTER & GAMBLE DISABILITY | ) | OHIO |
| COMMITTEE, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

Before: GRIFFIN, LARSEN, and NALBANDIAN, Circuit Judges.

LARSEN, Circuit Judge. Mark Lloyd alleges that the Procter & Gamble Disability Benefit Plan and other defendants wrongfully denied him long-term and short-term disability benefits in violation of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq*. The district court upheld the denial of long-term disability benefits and held that Lloyd was entitled to short-term benefits for only a brief period. Lloyd appeals. For the reasons that follow, we AFFIRM.

I.

From 2000 to 2017, Lloyd was an "IT Systems/Solutions Manager" at Procter & Gamble (P&G). During his time at the company, Lloyd struggled with a range of gastrointestinal issues and fibromyalgia. He claims that he was denied benefits due to him under the terms of P&G's disability plans (collectively, "the Plan").

A.

The P&G Disability Committee is the Plan's named fiduciary and administrator. After consulting with an outside company that assists with claim administration, a Review Board within P&G rules on each disability claim. An applicant may appeal the Review Board's decision to the Disability Committee, which makes the final determination.

The Disability Committee has "discretionary authority to interpret the terms of th[e] Plan" and to determine an applicant's eligibility for benefits. The applicant bears the burden to show his entitlement to benefits. To do this, he must provide objective medical evidence indicating that he meets the Plan's definition of "Total Disability" (for long-term benefits) or "Partial Disability" (for short-term benefits).

"Partial Disability" is defined as

a mental or physical condition resulting from an illness or injury because of which the Participant is receiving medical treatment and cannot perform regular duties of his or her current job but can perform other roles at the same site or other jobs outside of the Company. Thus, a condition of Partial Disability does not necessarily prevent the Participant from performing useful tasks, utilizing public or private transportation, or taking part in social or business activities outside the home.

"Total Disability" is defined as

a mental or physical condition resulting from an illness or injury which is generally considered totally disabling by the medical profession and for which the Participant is receiving regular recognized treatment by a qualified medical professional. Usually, Total Disability involves a condition of such severity as to require care in a hospital or restriction to the immediate confines of the home. The Trustees reserve the right to determine what is considered as "regular" and "recognized" treatment."

When a participant's employment at P&G ends, his rights under the Plan immediately end as well.

B.

Lloyd was diagnosed with irritable bowel syndrome with abdominal distention in 2009. He has undergone a variety of tests and treatments due to his abdominal pain and bloating.

In June 2014, Lloyd had his first appointment with Dr. Donald Kirby, a gastroenterologist at the Cleveland Clinic, specializing in intestinal motility disorders and related subjects. Lloyd reported "recurrent episodes of abdominal distention that seem[ed] to appear without reason" and would last from one to seventeen days. (Emphasis omitted.) Tests indicated that Lloyd had "normal gastric emptying," "normal small bowel transit time," and "slightly delayed colon transit time." Dr. Kirby concluded that Lloyd had "no bowel obstruction." (Capitalization omitted.) His initial impression was that Lloyd was suffering from "intermittent episodes of severe intestinal dysmotility," but he did not identify the exact cause.

About two months later, another doctor diagnosed Lloyd with a colon infection. Lloyd applied for disability benefits. The P&G Review Board found Lloyd to be disabled and awarded him benefits from September 8, 2014 to October 19, 2014. After the infection subsided, Lloyd returned to work.

Shortly thereafter, Lloyd again applied for disability benefits, citing generalized gastrointestinal issues with an onset date of January 23, 2015. Lloyd's primary care physician, Dr. Robert Hellman, said that Lloyd lacked the capacity to work "due to fatigue [and] pain." But Dr. Norman Gilinsky, Lloyd's regular gastroenterologist, and Dr. Sri Koneru, Lloyd's rheumatologist (who was treating Lloyd's fibromyalgia), both concluded that Lloyd was able to work. The Review Board credited Drs. Gilinsky and Koneru and denied Lloyd's claim. P&G then placed Lloyd on an unpaid leave of absence because of the amount of work he had been missing.

Lloyd unsuccessfully appealed the Review Board's decision. The Disability Committee observed that the notes from Lloyd's most recent visit to Dr. Hellman "contain[ed] no objective information to substantiate disabling fatigue or pain." The Disability Committee also obtained an independent review from another gastroenterologist, Dr. Sunil Sheth. Dr. Sheth reviewed Lloyd's medical records and agreed with Dr. Gilinsky's earlier assessment: Lloyd had "no functional impairments from [his] chronic diagnosis of irritable bowel syndrome that has been present since 2009," and "from a [gastrointestinal] standpoint, abdominal distention and bloating by itself does not result in any restrictions or limitations." The Disability Committee credited Dr. Sheth's opinion and upheld the denial of benefits on October 30, 2015.

## C.

On December 1, 2015, Lloyd filed another disability claim, which is the first claim in dispute here. Lloyd alleged that he had been disabled since November 3, 2015,[1] primarily due to gastrointestinal issues.

On January 19, 2016, the Review Board denied Lloyd's claim. It observed that, in early November, Lloyd's primary care physician, Dr. Anup Kanodia, had "described [him] as appearing well with no acute distress and with no documented clinical abnormalities." Two rheumatologists had also documented normal findings for Lloyd in November and December 2015 and had not recommended taking Lloyd off work. But, in late December, Lloyd visited Dr. Kanodia again, who, this time, concluded that he was unable to work in any capacity. The Review Board concluded that there was no indication that Lloyd "w[as] evaluated or treated by a gastroenterologist" during the claim period and that "there [wa]s a lack of objective medical

---

[1] P&G's disability plan generally required that disability claims be filed within four weeks of the onset date. So, November 3 was the earliest date Lloyd could claim when he filed in December.

information to support [a finding] that [Lloyd] w[as] partially or totally disabled as defined by the Plan beginning November 3, 2015."

On January 29, 2016, before he appealed to the Disability Committee, Lloyd had an appointment with Dr. Kirby. According to Dr. Kirby's notes, Lloyd had been to the emergency room with "abdominal distention and pain" four times since their last meeting in May 2015. Dr. Kirby also noted that Lloyd reported "severe difficulty going to work." "While [Lloyd] may have had Irritable Bowel [Syndrome] at some point in the past," Dr. Kirby concluded, Lloyd's "motility disorder ha[d] progressed." Dr. Kirby diagnosed Lloyd with chronic intestinal pseudo-obstruction (CIPO).

CIPO is a rare condition that produces symptoms similar to ordinary bowel obstruction. However, with CIPO, the obstruction does not result from a mechanical blockage inside the intestine. Rather, it results from a failure of intestinal muscles or nerves to move materials through the bowels normally. Dr. Kirby is one of the few experts on this disorder. According to him, it takes a long time to diagnose CIPO because one must test for, and rule out, other causes of the symptoms; for example, a mechanical blockage in the intestine due to an internal lesion could be another cause.

In February 2016, Lloyd filed his appeal with the Disability Committee, citing this new diagnosis.[2] The Committee returned to Dr. Sheth for an updated opinion. Dr. Sheth was skeptical. First, he disagreed with Dr. Kirby's diagnosis. Dr. Sheth explained that CIPO is an appropriate diagnosis "when there is evidence of obstruction without true mechanical obstruction," but Lloyd, "on multiple occasions during acute flares, has had no evidence of bowel distention, dilated loops,

---

[2] For purposes of all appeals, the Plan allowed Lloyd to rely on new information and records not submitted to the Review Board.

or air-fluid levels"—nor did he have any "evidence of impaired motility." Second, he faulted Dr. Kirby for focusing too much on Lloyd's diagnosis rather than his symptoms when deciding whether Lloyd was disabled. In Dr. Sheth's view, no objective medical evidence indicated a significant change in Lloyd's condition since the previous denials of benefits.

In April 2016, the Disability Committee upheld the denial of benefits. It reiterated Dr. Sheth's conclusion that "there ha[d] been no major change in" Lloyd's symptoms and that tests had "repeatedly resulted in negative findings with no evidence of bowel obstruction." For example, Lloyd's "x-ray and lab results were normal" during his January 2016 appointment with Dr. Kirby.

### D.

We now turn to Lloyd's second disputed denial of benefits. Lloyd obtained an additional review from a different gastroenterologist, Dr. Prakash Gyawali. He concluded that Lloyd's history "could be consistent with intermittent pseudoobstruction [CIPO], but there is likely a component of constipation predominant irritable bowel syndrome as well." Dr. Gyawali did not opine on whether Lloyd's condition was disabling.

In 2016, Lloyd began taking a new prescription medication, domperidone. It seemed to help. When "his local physician [Dr. Gilinsky] d[id] not want to [administer] it any longer" (for unspecified reasons), Lloyd returned to Dr. Kirby in January 2017 to ask him to continue the treatment. Dr. Kirby noted that Lloyd had not visited the emergency room in the past year, an improvement over Lloyd's previous experience. An x-ray revealed "a paucity of small bowel gas" and "no air-filled dilated loops of bowel" but "extensive fecal material throughout the right colon[,] suggest[ing] the possibility of constipation." (Capitalization omitted.) Dr. Kirby also wrote that

Lloyd still "had daily abdominal pain and Fibromyalgia which continued to be a major source of discomfort and disability." Dr. Kirby agreed to continue administering domperidone.

A week after his visit to Dr. Kirby, Lloyd filed what would become his final disability claim at P&G. He claimed disability beginning on January 16, 2017. On January 27, 2017, the same day Lloyd filed his disability claim, P&G terminated his employment. Lloyd has not alleged that he was fired because of his disability applications; the record and both parties are silent as to why P&G decided to end Lloyd's employment.

The Review Board denied Lloyd's claim. Lloyd appealed, submitting a variety of supporting materials. Among them were medical notes and two letters from Dr. Kirby; functional-capacity forms from his primary care physicians, Drs. Hellman and Kanodia; and Social Security disability questionnaires completed by Dr. Kanodia and by his holistic medicine specialist, Dr. Rene Blaha.

Lloyd also included email correspondence from Dr. Thomas Abell and Dr. John Wo about the general status of CIPO as a disabling condition. Dr. Abell opined that CIPO is "considered totally disabl[ing] at least in [his own] center and [he] suspect[ed] [in] most motility centers." But Dr. Abell said that "every day" his center "battle[s]" the fact that CIPO is "not on the list of 'approved disabilities.'" Dr. Wo wrote that CIPO can be disabling, but it "[d]epends" on the location of the defect within the intestinal tract. Neither Dr. Abell nor Dr. Wo opined on whether Lloyd himself was disabled.

The Disability Committee obtained an outside review from Dr. Cristina Strahotin, a certified gastroenterologist. Dr. Strahotin concluded that Lloyd had "a partial and temporary impairment." She noted that Lloyd's symptoms were consistent with CIPO but that they were also "non-specific" and "can be encountered in other conditions such as pan intestinal dysmotility,

irritable bowel," and others. Dr. Strahotin "agree[d] with Dr. Sheth," moreover, that the important question was "not so much what [Lloyd's] diagnosis is, but how . . . his symptoms [can] be managed in order to return him at least to a partial if not full meaningful employment." She found that Lloyd's symptoms did not allow him to work at full capacity. But she believed that Lloyd would be able to work with some reasonable accommodations "such as working from home, limited hours, [fewer] responsibilities requiring maximal concentration, more lenience for those days where he can only lay in bed, close proximity to a bathroom, and frequent bathroom breaks."

Dr. Strahotin disagreed with Dr. Kirby's conclusion that Lloyd was incapable of any work. In her view, Dr. Kirby appeared to rely on Lloyd's "extensive self-assessment diaries . . . and Dr. Kirby's knowledge of the natural history of [CIPO]." But Dr. Strahotin pointed out that Lloyd consistently had unremarkable test results. She believed that the computer-focused work of his IT position was still a possibility for him. And even though Drs. Hellman, Blaha, and Kanodia also supported Lloyd's total disability claim, Dr. Strahotin observed that each of them "rel[ied] heavily on Dr. Kirby's assessment," despite clinical notes of their own saying that Lloyd "appear[ed] well" or that his "symptoms [had] improved." These discrepancies and the lack of independent analysis undercut the other doctors' opinions in Dr. Strahotin's view.

Dr. Strahotin also responded to Lloyd's personal flare-up reports. Lloyd recorded that he spent an average of 17.5 days confined to his home each month from September 2016 to January 2017. For 8.8 days on average, Lloyd claimed to be entirely bedridden; Dr. Strahotin granted that Lloyd's bedridden days were the result of severe episodes that are unpredictable and unavoidable. Another 4.4 days were spent recovering from those episodes. But Dr. Strahotin pointed out that these recovery periods occurred in half-day intervals only. The remaining 4.3 days were due to

Lloyd's weekly bowel evacuation regimen. Dr. Strahotin opined that Lloyd could schedule these for the weekend, just like many patients do when preparing for a colonoscopy.

Dr. Strahotin also emphasized Lloyd's improvement since he started taking domperidone. He had maintained a stable weight and had avoided emergency room visits. In her final analysis, she concluded that Lloyd's "condition . . . changed from totally impaired to partially impaired in October 2016" when he began receiving domperidone.[3]

The Disability Committee denied Lloyd total and partial disability benefits on October 20, 2017. For support, it looked to Dr. Strahotin's conclusion that Lloyd could have worked with accommodations, the lack of recent emergency room visits, Lloyd's normal test results, statements from Dr. Kanodia in February 2017 about how Lloyd "was in no distress and appeared well," and the fact that Lloyd's symptoms were "intermittent."

## II.

Lloyd filed the present suit in federal court against the Procter & Gamble Disability Benefit Plan, the Procter & Gamble Long Term Disability Allowance Policy Plan, and the Procter & Gamble Disability Committee (collectively, "Defendants"). He alleged that the Plan entitled him to long-term or, at a minimum, short-term benefits pursuant to his December 2015 and January 2017 applications, and that denying him these benefits violated ERISA. *See* 29 U.S.C. § 1132(a)(1)(B). His complaint also requested "reinstatement of [his] status as an active employee of Procter & Gamble."

---

[3] Dr. Strahotin found that the domperidone treatment began in October 2016, but medical notes from Dr. Kirby and Dr. Gyawali suggest that treatment began earlier that year—by May 2016 at the latest. This discrepancy does not negatively affect the significance of Dr. Strahotin's report, however. To the contrary, the earlier start date for domperidone better supports her finding that the drug contributed to the end of Lloyd's emergency room visits early that year.

Lloyd and Defendants filed cross-motions for judgment on the administrative record. The district court upheld most, but not all, of Defendants' decisions. With respect to Lloyd's December 2015 application, the court found that it was not arbitrary and capricious for Defendants to deny Lloyd short-term or long-term benefits. With respect to Lloyd's January 2017 application, the court likewise upheld the denial of total disability benefits. But the court found that it was arbitrary and capricious for Defendants not to award Lloyd partial disability benefits from January 17, 2017 through January 28, 2017. Lastly, the district court refused Lloyd's request for "reinstatement" of his employment status at P&G.

Lloyd timely appeals. He challenges three aspects of the district court's decision: (1) the denial of benefits in connection with his 2015 application, (2) the denial of total disability benefits for his 2017 application, and (3) the refusal to grant "reinstatement" of his employee status, which would have extended the time period of his 2017 benefits award. Defendants have not cross-appealed and do not dispute the district court's limited award of partial disability benefits on the 2017 application.

III.

ERISA requires the P&G Disability Committee, as the Plan's administrator and named fiduciary, to administer the Plan in accordance with its written provisions. 29 U.S.C. § 1104(a)(1)(D); *Best v. Cyrus*, 310 F.3d 932, 935 (6th Cir. 2002). The Plan gives the Disability Committee discretion to interpret the Plan's language and to determine an individual's eligibility for benefits. Where a fiduciary has such discretion, we review a denial of benefits using the "extremely deferential" arbitrary and capricious standard. *McClain v. Eaton Corp. Disability Plan*, 740 F.3d 1059, 1064 (6th Cir. 2014) (citation omitted); *see Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). The burden is on the claimant to show that the fiduciary's

decision was arbitrary and capricious. *Farhner v. United Transp. Union Discipline Income Prot. Program*, 645 F.3d 338, 343 (6th Cir. 2011). We review de novo the district court's conclusion that Defendants' relevant decisions were not arbitrary and capricious.[4] *Davis v. Hartford Life & Accident Ins. Co.*, 980 F.3d 541, 547 (6th Cir. 2020).

We have described the arbitrary and capricious standard as "the least demanding form of judicial review." *Williams v. Int'l Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000). While we will not simply "rubber stamp" Defendants' decision, we must uphold it "if it results from a deliberate principled reasoning process and is supported by substantial evidence." *McClain*, 740 F.3d at 1064–65 (citation omitted). "Substantial evidence is more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Davis*, 980 F.3d at 549 (quoting *Gen. Med., P.C. v. Azar*, 963 F.3d 516, 520 (6th Cir. 2020)). "When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *McClain*, 740 F.3d at 1065 (quoting *Shields v. Reader's Digest Ass'n*, 331 F.3d 536, 541 (6th Cir. 2003)).

A.

1.

To be eligible for benefits, Lloyd needed to satisfy the Plan's definition of "Partial Disability" or "Total Disability." Lloyd argues that Defendants misinterpreted the latter.

As a reminder, the Plan defines "Total Disability" as follows:

> a mental or physical condition resulting from an illness or injury which is generally
> considered totally disabling by the medical profession and for which the Participant

---

[4] Our caselaw is divided as to whether we review the district court's underlying factual findings de novo or only for clear error. *Wallace v. Oakwood Healthcare, Inc.*, 954 F.3d 879, 890 (6th Cir. 2020); *Hutson v. Reliance Standard Life Ins. Co.*, 742 F. App'x 113, 117–18 (6th Cir. 2018). We need not determine which standard is the correct one, however. Even without deferring to any factual findings that the district court made, Lloyd's claims fail.

is receiving regular recognized treatment by a qualified medical professional. Usually, Total Disability involves a condition of such severity as to require care in a hospital or restriction to the immediate confines of the home. The Trustees reserve the right to determine what is considered as "regular" and "recognized" treatment."

According to Lloyd, this definition required him to show only that (1) CIPO is generally considered totally disabling in the medical profession and (2) he was usually confined to his home because of his condition.[5] Therefore, Lloyd says, it is immaterial whether his particular case of CIPO prevented him from working. In Lloyd's view, the "Total Disability" definition is not tied to work capacity in any way.

The Disability Committee, by contrast, focused on whether Lloyd's personal gastrointestinal issues rendered him unable to work. In other words, the Committee appears to have assumed that the medical profession generally would understand the concept of "disability" to include an assessment of one's ability to work. The Committee also assumed that the medical profession would assess disability with respect to each individual, rather than relying on categorical determinations about certain diseases or conditions. The Committee made no specific finding about whether CIPO is generally considered disabling—or, for that matter, whether Lloyd has CIPO.

Lloyd offers a plausible alternative way to interpret the Plan's definition of "Total Disability," but because the Plan gives Defendants interpretive discretion, our task is not to select the best reading of the Plan. *See Brown v. Fed. Express Corp.*, 610 F. App'x 498, 504 (6th Cir. 2015) (citing *Jones v. Metro Life Ins. Co.*, 385 F.3d 654, 660 (6th Cir. 2004)). Rather, Lloyd must persuade us that Defendants *unreasonably* interpreted it. *See Moos v. Square D Co.*, 72 F.3d 39,

---

[5] Lloyd appears to omit the requirement that the applicant be "receiving regular recognized treatment by a qualified medical professional," but that requirement is not in dispute here.

42 (6th Cir. 1995) (citing *Cook v. Pension Plan for Salaried Emps. of Cyclops Corp.*, 801 F.2d 865, 870 (6th Cir. 1986)); *Farhner*, 645 F.3d at 343 (placing burden on plaintiff to show plan administrator's decision was arbitrary and capricious). This is not a case where the plain meaning of the disputed language defeats Defendants' interpretation. *Cf. Brown v. United of Omaha Life Ins. Co.*, 661 F. App'x 852, 857 (6th Cir. 2016) (finding that a plan administrator contradicted the plain meaning of "elect"); *Kovach v. Zurich Am. Ins. Co.*, 587 F.3d 323, 332–33 (6th Cir. 2009) (reversing the denial of benefits based on the plain meaning of "accidental").

First, consider Lloyd's argument that work capacity is irrelevant to the "Total Disability" definition. He points out that the definition of "*Partial* Disability" requires that the participant "cannot perform regular duties of his or her current job but can perform other roles." Meanwhile, the "Total Disability" definition contains no direct reference to work capacity. At first, this looks like a case crying out for application of the principle *expressio unius est exclusio alterius* ("the mention of one thing implies the exclusion of another"). *See First Am. Title Co. v. Devaugh*, 480 F.3d 438, 453 (6th Cir. 2007). However, the "Total Disability" definition also requires that the applicant's condition be "considered totally disabling by the medical profession." Lloyd never grapples with this language. Yet it is not unreasonable to surmise—as Defendants apparently did—that the medical profession would include a work-capacity component among the relevant criteria. After all, our "disability" inquiry takes place in the context of a patient's application for benefits from his employer's disability-insurance plan. The word "disability" indicates an "inability" or "incapacity" to do *something*. *See Disability*, Oxford English Dictionary, https://www.oed.com/view/Entry/53381 (last visited Aug. 30, 2021) ("Lack of ability (*to* discharge any office or function); inability, incapacity; weakness."). In the context of Lloyd's

benefits application, it would be most natural for a medical examiner to assess Lloyd's potential inability or incapacity *to work*.

Moreover, the fact that the Plan's "Partial Disability" definition refers to work capacity does not help Lloyd as much as he thinks. The Plan describes the relevant categories as "Total" and "Partial" disability, suggesting two categories located along a spectrum. And if "Partial Disability" is based on work capacity, then "Total Disability" must be too (the plain language of the Plan giving no indication to the contrary). Otherwise, it would be *easier* to show "Total Disability" than "Partial Disability" in many cases. Consider, for example, a highly contagious disease that, in the abstract, is "generally considered totally disabling." Under Lloyd's reading, someone with a peculiarly mild case would categorically qualify as *totally* disabled. But the same individual might be able to "perform [the] regular duties of his . . . current job," while in quarantine at home, meaning that he would not be *partially* disabled. The Plan's language does not command this upside-down result. The Plan's definition of "Total Disability" incorporates the medical profession's general understanding of whether an illness or injury is totally disabling. It was not unreasonable for Defendants to assume that the medical profession would evaluate work capacity in determining whether an individual is totally disabled for purposes of an employer-sponsored disability-insurance application. Indeed, all the doctors whom Defendants and Lloyd consulted appear to have done just that. Therefore, we reject Lloyd's argument that he should not have been required to show an inability to work.

Second, and relatedly, Lloyd argues that Defendants were required to evaluate only whether CIPO is generally considered disabling (and, presumably, whether Lloyd's condition is CIPO), not whether Lloyd's personal condition was disabling. Once again, the dispute concerns the meaning of the phrase, "an illness or injury which is generally considered totally disabling by

the medical profession." And, once again, Lloyd offers a plausible reading of the text. Yet, his interpretation is not the only acceptable one.

The simple term "illness" carries no specific level of particularity or abstraction. It can refer to a disease generically, such as CIPO, or it can refer to an individual instance of disease, such as Lloyd's personal illness. Here, the Plan documents do not define "illness." While the disputed phrase also includes the word "generally," it is unclear whether that modifies "illness" or the subsequent phrase about the "medical profession." So perhaps Defendants are right that they needed to consider only Lloyd's personal case of illness. Or perhaps, as Lloyd suggests, Defendants first needed to determine Lloyd's diagnosis and then decide whether that diagnosis, in abstract terms, is generally disabling. But again, we must uphold Defendants' interpretation if it is reasonable. While Lloyd's competing interpretation has some appeal, we must "afford[] the plan administrator 'great leeway' in interpreting ambiguous terms." *Fenwick v. Hartford Life & Accident Ins. Co.*, 841 F. App'x 847, 853 (6th Cir. 2021) (quoting *Moos*, 72 F.3d at 42).

Defendants' interpretation is not without appeal of its own. Sometimes it would make little sense to ask whether a disease is disabling in only the most abstract terms. Lloyd's is one such case. Dr. Kirby referred to CIPO as a "spectrum" of disease, suggesting that it may differ in severity between patients or across time for a single patient. And Dr. Wo remarked that CIPO is disabling only if it affects certain areas of the intestinal tract. It would be surprising, therefore, if Defendants had to consider the disabling nature of CIPO in the broadest terms instead of assessing the severity of Lloyd's individual case. And the second sentence of the "Total Disability" definition suggests that the Plan must consider the "severity" of an individual's condition. We do not read that sentence, as Lloyd does, to ask whether a claimant is *usually confined* to his home or the hospital. Rather, we read it to say that qualifying illnesses or injuries *usually* will be of such

severity as to cause the individual patient to be confined to his home or the hospital. It was not unreasonable for Defendants to assess Lloyd's personal illness instead of focusing on CIPO in the abstract.

Defendants implemented a permissible reading of the Plan's ambiguous "Total Disability" definition. We therefore defer to that interpretation and apply it throughout our analysis below. *See Jones*, 385 F.3d at 661; *Moos*, 72 F.3d at 42.

2.

Defendants determined that Lloyd had failed to meet the Plan's definition of either "Total" or "Partial Disability." Lloyd challenges that conclusion.

"Generally, when a plan administrator chooses to rely upon the medical opinion of one doctor over that of another in determining whether a claimant is entitled to ERISA benefits, the plan administrator's decision cannot be said to have been arbitrary and capricious." *McDonald v. W.S. Life Ins. Co.*, 347 F.3d 161, 169 (6th Cir. 2003). This is "because it would be possible to offer a reasoned explanation, based upon the evidence, for the plan administrator's decision." *Id.*; *see Davis*, 980 F.3d at 548. The same principle applies to both of Lloyd's disputed claims.

For the 2015 claim, the Disability Committee credited Dr. Sheth and, like him, focused on the severity of Lloyd's individual symptoms rather than Dr. Kirby's new CIPO diagnosis. The Committee observed that there had been "no major change in [Lloyd's] pattern of abdominal disten[t]ion." Tests from Lloyd's ER visits had shown "no evidence of bowel obstruction." Dr. Kirby concluded that Lloyd's x-ray and lab results were "normal" at his January 2016 appointment. Despite Dr. Kirby's new diagnosis, no new objective medical data supported a finding of total or partial disability.

Thus, Lloyd's argument that Defendants lacked sufficient reasons to reject Dr. Kirby's opinion is not well taken. Defendants "w[ere] not required to 'automatically . . . accord special weight' to [Dr. Kirby's] opinion simply because he was one of [Lloyd's] treating physicians." *See Davis*, 980 F.3d at 549 (ellipsis in original) (quoting *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003)). Defendants' determination with respect to Dr. Kirby "was rational and based on the evidence." *See id.* Nothing more was required. *See Balmert v. Reliance Standard Life Ins. Co.*, 601 F.3d 497, 504 (6th Cir. 2010); *Evans v. UnumProvident Corp.*, 434 F.3d 866, 877 (6th Cir. 2006).

Lloyd faults Defendants for failing to seek a second opinion after receiving Dr. Sheth's report. In concluding his March 2016 report, Dr. Sheth noted his "disagree[ment] with [Dr. Kirby,] who has basically stated that [the] impairment is because of a new diagnosis rather than focusing on the symptoms which remain unchanged;" therefore, Dr. Sheth thought, "it may not be unreasonable, if necessary, to have a second GI reviewer comment on impairment." Read in context, this is not the glaring disclaimer Lloyd depicts. Dr. Sheth was emphasizing Dr. Kirby's decision not to focus on objective evidence of Lloyd's symptoms. For this reason, Dr. Sheth believed that it might be advisable to consult a second physician who would focus on that issue. Lloyd provides no authority to support his argument that it was unreasonable for Defendants to rely on Dr. Sheth's assessment rather than seeking out another opinion.

The Committee also mentioned that Lloyd's two rheumatologists had not recorded any disabling impairments. Moreover, Lloyd's primary care physician, Dr. Kanodia, who supported Lloyd's total disability claim in December 2015, had described Lloyd as "appearing well with no acute distress" less than two months earlier. Dr. Kanodia's notes lacked any explanation for the change in opinion. Given the range of conflicting—and shifting—professional opinions and the

lack of objective data supporting a disabling condition, it was not arbitrary or capricious to deny Lloyd total or partial disability benefits in connection with his December 2015 application. Contrary to Lloyd's suggestion, Defendants did not arbitrarily ignore or discount the views of his treating physicians.

Similar reasons support the Disability Committee's denial of long-term disability benefits for Lloyd's January 2017 claim. The Committee agreed with Dr. Strahotin that "Lloyd would have been able to work with job modifications." Lloyd appeared to have improved in recent months; for example, he had not visited the ER since at least January 2016. Lloyd's domperidone prescription likely explained some of this improvement in Dr. Strahotin's view. And treatment notes from Drs. Kirby, Hellman, and Kanodia showed unremarkable examination results. Substantial evidence supports the Committee's finding that Lloyd's intermittent symptoms would have allowed him to work at least part-time.

Lloyd objects to Dr. Strahotin's finding that he would have been able to work with some modifications because, he says, similar modifications were ineffective when he tried them in early 2015, before P&G placed him on leave. Without citing any authority, Lloyd argues that it was arbitrary and capricious for Defendants not to ask Dr. Strahotin whether Lloyd's prior work history would change her recommendation. We are not persuaded. Dr. Strahotin conducted a full review of Lloyd's medical records and made a recommendation about his ability to work during the relevant period in January 2017. She found that Lloyd's symptoms improved when he started taking domperidone in 2016. Even if a plan administrator might be obliged to request clarification in some circumstances, the relevant timeframe for Dr. Strahotin's review and her findings about the effectiveness of the medication make it especially clear that failure to do so was not unreasonable in this case.

Next, Lloyd emphasizes Dr. Strahotin's statement that "his condition . . . changed from totally impaired to partially impaired in October 2016." Because of this statement, Lloyd contends that Defendants should have approved long-term benefits up to or through October 2016 and partial disability benefits thereafter. This argument has several flaws. First, Dr. Strahotin offered no express opinion on *when* Lloyd's condition became totally disabling prior to October 2016, and medical notes from Dr. Kirby and Dr. Gyawali suggest that Lloyd began receiving domperidone earlier than Dr. Strahotin indicated. Second, and more importantly, the alleged disability onset date for Lloyd's final application was in January 2017. The Plan's express terms limit disability benefits to the relevant claims period, which generally may not begin any earlier than four weeks before the application date. Lloyd never explains how Defendants would have had authority to award benefits starting in, or prior to, October 2016. Third, while it is true that Lloyd's December 2015 application had an onset date prior to October 2016, Dr. Strahotin's report cannot render Defendants' denial of that application arbitrary and capricious. Her report did not exist in April 2016 when the Disability Committee rendered its final decision on that claim. We "may consider only the evidence available to the [Plan] at the time the final decision was made." *McClain*, 740 F.3d at 1064. Thus, Dr. Strahotin's report does not support either of Lloyd's two claims for long-term disability benefits.

With respect to his January 2017 claim, Lloyd argues that Defendants unreasonably failed to place greater emphasis on the report that Lloyd obtained from Dr. Gyawali, another gastroenterologist. Dr. Gyawali agreed that Lloyd's medical history was consistent with CIPO, though he also opined that irritable bowel syndrome likely contributed to his symptoms. He agreed

with Dr. Kirby's treatment plan[6] and did not request further testing. However, Dr. Gyawali never gave any explicit opinion on whether Lloyd's condition was disabling. Therefore, it seems that Dr. Gyawali's report may have been of minimal additional value to Defendants' decisionmaking process. Defendants did not arbitrarily or capriciously discount or disregard that report.

The relevant decisions "result[ed] from a deliberate principled reasoning process and [are] supported by substantial evidence." *See id.* at 1064–65 (citation omitted). Defendants did not act arbitrarily and capriciously.

3.

Lloyd advances several broad objections to Defendants' determination, but none hits the mark. First, Lloyd argues that neither Dr. Sheth nor Dr. Strahotin were qualified to opine on his condition once Dr. Kirby diagnosed him with CIPO. Though he acknowledges that Sheth and Strahotin are both board-certified gastroenterologists, he asserts that "Dr. Sheth's main experience . . . [is] pancreatic disease" and Dr. Strahotin's primary focus is "the treatment of liver disease." Yet Lloyd concedes that, as a certified gastroenterologist, Dr. Sheth was qualified to review his "unspecified bowel issues" prior to the CIPO diagnosis. Presumably, the same would hold true for Dr. Strahotin. But Lloyd posits that the CIPO diagnosis changed things and required Defendants to at least make efforts to consult with a CIPO specialist.

CIPO is a rare disorder. Dr. Strahotin said there are "only a handful of experts in the country." And perhaps consulting with such an expert would be good policy. But we cannot say that ERISA demands such a course. "ERISA does not demand an examination by the narrowest

---

[6] While Dr. Gyawali agreed with Dr. Kirby's treatment plan, Dr. Gyawali also recommended additional treatments beyond what Dr. Kirby had prescribed. For example, Dr. Gyawali, "also recommend[ed] daily linaclotide (145 micrograms daily), which w[ould] help maintain a regular bowel movement pattern (rather than [the] current regimen of bowel movements every other day)."

of specialists." *Okuno v. Reliance Standard Life Ins. Co.*, 836 F.3d 600, 610 (6th Cir. 2016); *see also Davis v. Aetna Life Ins. Co.*, 699 F. App'x 287, 295 (5th Cir. 2017) (per curiam) ("[A] plan administrator does not abuse its discretion merely by selecting a reviewing physician who does not have the exact same specialty as the claimant's treating physician."). Rather, ERISA requires "consult[ation] with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment." 29 C.F.R. § 2560.503–1(h)(3)(iii); *Okuno*, 836 F.3d at 610. Whether a medical professional "has appropriate training and experience depends on the facts of the case." *Roebuck v. USAble Life*, 992 F.3d 732, 739 (8th Cir. 2021). For example, in *Okuno*, we found an administrator's reliance on the opinions of an orthopedist and a pulmonologist insufficient to support its denial of a claim that depended on the claimant's psychiatric issues. 836 F.3d at 610–11.

By contrast, Dr. Sheth and Dr. Strahotin were adequately qualified in the relevant field. Both are experienced, board-certified gastroenterologists. Dr. Sheth is the Co-Director of the Pancreas Center at Beth Israel Medical Center and an Assistant Professor of Medicine at Harvard Medical School. Dr. Sheth's bio lists "[g]eneral [g]astroenterology" and a variety of related topics under his "clinical interests," not just pancreatic diseases. According to Dr. Strahotin's CV, she has several years' experience working as a gastroenterologist at a hospital and a range of related clinical and academic experience. Of course, neither physician shares Dr. Kirby's expertise regarding CIPO. But requiring Defendants to rely exclusively on physicians with narrow expertise would be in tension with regulations and binding caselaw that admonish us not to demand that Defendants locate "the narrowest of specialists." *Id.* at 610; *see* 29 C.F.R. § 2560.503–1(h)(3)(iii).

Second, Lloyd faults Defendants for never ordering a physical examination and instead relying on the opinions of doctors who conducted only file reviews. There is "nothing inherently

objectionable about a file review by a qualified physician in the context of a benefits determination," but "the failure to conduct a physical examination—especially where the right to do so is specifically reserved in the plan—may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination." *Helfman v. GE Grp. Life Assurance Co.*, 573 F.3d 383, 393 (6th Cir. 2009) (citation omitted). But Lloyd never explains how the failure to order a physical exam calls into doubt the thoroughness or accuracy of Defendants' decisions here. Both Drs. Sheth and Strahotin conducted a thorough file review, summarizing Lloyd's lengthy treatment history. And they responded in detail to other physicians, who believed that Lloyd was disabled. *Cf. Cook v. Prudential Ins. Co. of Am.*, 494 F. App'x 599, 606 (6th Cir. 2012) (explaining that a file review may be less reliable "if the physician fails 'to describe the data he reviewed'" or relies on "'credibility determinations concerning the patient's subjective complaints'" (quoting *Smith v. Cont'l Cas. Co.*, 450 F.3d 253, 263 (6th Cir. 2006))); *Curry v. Eaton Corp.*, 400 F. App'x 51, 64, 66–67 (6th Cir. 2010) (per curiam) (upholding denial of benefits based on reviewing physicians' analyses of treatment notes from others).

Third, Lloyd points to the "inherent conflict of interest" that results when a plan administrator both decides claims and would be responsible for paying benefits out of its own funds. It is undisputed that Defendants play this "dual role" here, which does "create[] a conflict of interest." *See Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008). "However, this conflict of interest does not displace the arbitrary and capricious standard of review; rather, it is a factor that we consider when determining whether the administrator's decision to deny benefits was arbitrary and capricious." *Evans*, 434 F.3d at 876.

Lloyd points to no evidence that this "conflict in any way influenced the plan administrator's decision." *Id.* Yet, our caselaw "requires a plaintiff not only to show the purported

existence of a conflict of interest, but also to provide 'significant evidence' that the conflict actually affected or motivated the decision at issue." *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 165 (6th Cir. 2007) (quoting *Peruzzi v. Summa Med. Plan*, 137 F.3d 431, 433 (6th Cir. 1998)); *see Frazier v. Life Ins. Co. of N. Am.*, 725 F.3d 560, 570 (6th Cir. 2013).  Defendants' general financial incentives, on their own, are not enough to overcome our conclusion that the relevant decisions were not arbitrary and capricious.

4.

Next, Lloyd asserts that, in addition to denying him his rightful benefits, Defendants violated ERISA's procedural safeguards.  *See* 29 U.S.C. § 1133; 29 C.F.R. § 2560.503–1. Specifically, he argues that Defendants "never provided [him] with a description of any additional material or information that would be necessary for him to perfect his claims," *see* 29 C.F.R. § 2560.503–1(g)(1)(iii), "never provid[ed] [him] with an adequate or meaningful explanation of why it disagreed with the opinions [of] his treating physicians," *see id.* § 2560.503–1(g)(1)(vii)(A)(i), and denied him adequate process to support a "full and fair review" of his claims, *see* 29 U.S.C. § 1133(2); 29 C.F.R. § 2560.503–1(h)(1).

Lloyd first asserted these procedural violations in his motion for judgment on the administrative record.  He did not include them in his complaint.  Accordingly, these claims were not properly before the district court.  *See J.H. v. Williamson County*, 951 F.3d 709, 722 (6th Cir. 2020).  The district court did not address them, and we will not address them on appeal.  *See Huckaby v. Priest*, 636 F.3d 211, 218 (6th Cir. 2011); *Nicely v. McBrayer, McGinnis, Leslie & Kirkland*, 163 F.3d 376, 381 (6th Cir. 1998).  We do note, however, that Defendants regularly provided Lloyd with detailed descriptions of the types of materials that would be required to

support his claims. And, as explained above, Defendants gave a fair review to each of his relevant claims.

B.

Lloyd also claims that he is entitled to "reinstatement of [his] status as an employee" at P&G. The exact scope of Lloyd's desired relief is unclear. At a minimum, Lloyd asks to be treated as an employee "for purposes of ongoing benefit eligibility" beyond his date of termination. He intimates that, because the district court awarded him partial disability benefits on his January 2017 claim, he ought to be eligible to receive those benefits on an ongoing basis. While less clear, it appears that he also requests reinstatement of his full employment status at P&G. *Cf. Griggs v. E.I. DuPont de Nemours & Co.*, 237 F.3d 371, 385 (4th Cir. 2001) (construing request for "reinstatement" in ERISA denial-of-benefits case as a request for both plan-participant status and restoration of the plaintiff's "position of employment").

ERISA allows courts to grant "appropriate equitable relief" in connection with a denial-of-benefits claim. 29 U.S.C. § 1132(a)(3); *see Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 209–10 (2002); *Davis*, 980 F.3d at 550. We have acknowledged that some degree of reinstatement may be available as equitable relief in denial-of-benefits cases. *See Schwartz v. Gregori*, 45 F.3d 1017, 1023 (6th Cir. 1995); *see also Varity Corp. v. Howe*, 516 U.S. 489, 492 (1996) (affirming reinstatement of employees as plan participants); 27 John Bourdeau, et al., Federal Procedure, Lawyers Edition § 61:382 (June 2021 update).

Here, however, the text of the Plan makes clear that P&G retains authority to terminate a participant's employment at any time for any reason permitted by law. Upon termination, the participant's rights under the Plan expire immediately. Thus, by awarding partial disability benefits from the relevant disability onset date until his date of termination, the district court has

-24-

already afforded Lloyd the relief to which the Plan entitled him.  Lloyd acknowledges the Plan's provisions related to termination, but he fails to offer any response to them.  Indeed, Lloyd has failed to specify any authority—whether in the Plan's terms or in governing law—in favor of his request for equitable relief.  For instance, although ERISA makes it "unlawful for any person to discharge . . . a participant . . . for exercising any right to which he is entitled under the provisions of an employee benefit plan," 29 U.S.C. § 1140, Lloyd has never alleged that he was fired for exercising his rights.  We find no error in the district court's refusal to grant the requested equitable relief.

* * *

We AFFIRM.