NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0322n.06

No. 23-5226

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

BALLENTINE EXPRESS CORP.,

    Plaintiff-Appellant,

v.

EAN HOLDINGS, LLC, dba Enterprise Rentals,

    Defendant-Appellee,

STEVEN D. BARKSDALE,

    Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**FILED**
Jul 24, 2024
KELLY L. STEPHENS, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TENNESSEE

OPINION

Before: SUTTON, Chief Judge; STRANCH and DAVIS, Circuit Judges.

**JANE B. STRANCH, Circuit Judge.** This case involves various challenges to pretrial and trial decisions during an insurance dispute. Plaintiff Ballentine Express Corporation (BEC) sought a declaratory judgment against EAN Holdings, LLC (Enterprise), asking the district court to declare that Enterprise owed BEC $750,000 of Business Travel Insurance. After the court denied cross-motions for summary judgment, the case proceeded to trial, where the jury rejected BEC's contention that the parties had agreed to $750,000 in coverage. BEC appeals the court's denial of its partial summary judgment motion and numerous decisions made at and before trial. We **AFFIRM**.

## I.   BACKGROUND

BEC was a Memphis-based commercial trucking company owned and operated by Joseph Ballentine.   As a freight carrier, BEC contracted with various companies to haul goods to customers.   Mr. Ballentine owned, leased, and rented box trucks to conduct BEC's business.

In August 2017, BEC and Enterprise executed a Master Truck Rental Agreement.   The Master Agreement applied to each of BEC's subsequent truck rentals from Enterprise and was governed by Tennessee law.   Under the Master Agreement, unless BEC maintained liability protection for accidents through Enterprise itself, it was required to provide a certificate of insurance showing that it separately maintained certain other insurance.   Among the insurance that BEC was required to maintain in such a scenario was

> liability for negligence arising out of the use or operation of vehicles by its employees or agents (including all Drivers) with minimum split limits of $100,000 bodily injury or death per person, $300,000 bodily injury or death per occurrence and $50,000 property damage per occurrence, or a combined single limit of $300,000 . . . .

R. 37-1 ¶ 13(a), Master Agreement, PageID 272.

Enterprise offered optional liability protection for accidents through "Business Travel Insurance," or "BTI."   As of early November 2017, BEC was not being charged for BTI under the Master Agreement.   BEC's account was then updated in mid-November to add BTI coverage, though the parties would later dispute the amount of coverage provided.

On January 5, 2018, BEC rented a truck from Enterprise weighing over 10,000 pounds.   A day later, while driving the rented truck, one of BEC's drivers got into an accident with Steven Barksdale.   Barksdale sued BEC in Mississippi in September 2019 for over $2 million in damages. According to BEC, Enterprise initially declined to offer BEC any coverage for liability in the Mississippi case, and then later offered only $100,000 in coverage.   In April 2021, BEC initiated

this case in the Western District of Tennessee. BEC titled its operative complaint as one for declaratory judgment and sought several forms of declaratory relief. Among other requests, BEC asked the court to declare that Enterprise breached duties under the Motor Carrier Act of 1980 (MCA) and the Federal Motor Carrier Safety Regulations (FMCSR), and that Enterprise was liable for $750,000 or more in damages in the Mississippi lawsuit.

Enterprise filed a motion for partial dismissal. It argued that as an insurer (rather than a motor carrier), it was not subject to requirements established by the MCA and the FMCSR, including the FMCSR's requirement that vehicles over 10,000 pounds carry $750,000 or more in financial responsibility. *See* 49 C.F.R. § 387.9(1). The district court agreed, finding that neither the MCA, FMCSR, nor analogous Tennessee law imposed on Enterprise a duty to provide liability coverage of $750,000. But it also noted that an insurer could agree to provide coverage conforming to the MCA or FMSCR. Ultimately, it found the Master Agreement ambiguous regarding the amount of coverage provided, and declined to resolve the case at the pleadings stage.

The parties filed cross-motions for summary judgment, and while they were pending, the district court held a pretrial conference on February 3, 2023. At the conference, BEC contended that it had pleaded not only a declaratory judgment action but also actions for breach of contract and negligent failure to procure insurance coverage, and that these claims should also be sent to the jury. Enterprise disagreed, noting that it had prepared its case and witnesses expecting that it would not have to address any damages issues. Expressing doubt as to whether BEC's complaint could be read as encompassing a negligence claim, the court noted that it found the "question about a breach" of contract claim "a little closer." After hearing argument, the court expressed concern that adding any claim could "add[] a layer of complexity" to what it viewed as a "pretty

straightforward" declaratory judgment action, and made no final decision on exactly which claims the jury would be asked to decide.

On February 7, the district court denied both parties' summary judgment motions. BEC's motion for partial summary judgment had focused on an excess insurance policy between ACE American Insurance Company and Enterprise (the ACE Policy). The ACE Policy covers, as "additional insureds," renters like BEC who purchased insurance coverage through Enterprise and specifies that it will cover only losses in excess of Enterprise's "retained limit," which it defines as "equal to the minimum financial responsibility required by state." BEC requested that the court make several findings concerning Tennessee statutory law and Enterprise's obligations under the ACE Policy, including that this Policy obligated Enterprise to tender $750,000 to BEC. Enterprise argued—among other things—that interpretation of the ACE Policy was not fairly encompassed within BEC's amended complaint, which sought adjudication of rights of the "Master Truck Rental Agreement, the insurance liability protection purchased by Ballentine from Enterprise thereunder, and state and federal law in relation to the Barksdale Lawsuit." The district court agreed with Enterprise, found that BEC's request to adjudicate the ACE Policy represented a new claim not properly presented in a summary judgment motion, and denied BEC's motion.

The court took up additional issues at a second pretrial conference on February 16. First, it denied BEC's motion to prevent Enterprise from introducing Ballentine's prior criminal convictions for the purpose of impeaching his testimony at trial. The court specified, however, that while Enterprise would be able to mention the fact that he "was convicted," it would not be permitted to "get into the factual background" of the convictions. Next, it noted that it was "inclined" to deny BEC's pretrial motion to exclude documents related to a separate insurance policy between BEC and Shelter Insurance Company (the Shelter Policy). Finally, the court

indicated skepticism that the ACE Policy's introduction would add to the jury's understanding of the case.

The next day, BEC filed a motion to continue the scheduled trial. BEC expressed concern that, based on the district court's comments at the conference, it would not be able to effectively present its case to the jury. After receiving further briefing, the district court denied BEC's motion.

On February 21, the first day of trial, the court addressed several matters with the parties before prospective jurors arrived. First, the court determined it would only ask the jury to resolve the single question of whether Enterprise agreed to provide BEC with $750,000 in BTI insurance. It concluded that this was "the right question under these circumstances," thereby declining to ask the jury to evaluate any contract-breach or negligence claim. Second, the court noted that despite the concerns expressed in BEC's continuance motion, it had not ruled out permitting the introduction of the ACE Policy if BEC could show that Policy's relevance during trial.

The jury trial commenced. After Enterprise employee Shea Hargett testified, Mr. Ballentine took the stand. He testified that at some point after signing the Master Agreement in August 2017, an Enterprise employee called to tell him that there was a mistake on his account, and that Enterprise had given him "state minimum coverage," which Ballentine knew was $750,000. Later, Enterprise's counsel used the Shelter Policy to cross-examine Ballentine and elicited that he had been convicted of aggravated assault. When Enterprise attempted to introduce additional details about that conviction, however, the district court sustained BEC's objection. The court instructed the jury that "the circumstances surrounding" Mr. Ballentine's conviction were "not the point of this case," and that the jury could consider that conviction only "in weighing credibility." On redirect examination, Ballentine explained why, despite owning the Shelter

Policy, he believed he had additional insurance through Enterprise. The court was prepared to let BEC's counsel proceed with additional questions, but counsel declined to do so.

Hargett returned to the stand to explain Enterprise's theory of the case. He testified that BTI coverage in the amount of $100,000 bodily injury or death per person, $300,000 bodily injury or death per occurrence and $50,000 property damage per occurrence—referred to as 100/300/50 split limits—was added to Ballentine's account in mid-November after Enterprise discovered that Ballentine had no separate insurance on file that satisfied the Master Agreement. Hargett further testified that it would have been impossible for Ballentine to have received $750,000 in BTI coverage because Enterprise offers no such policy. On cross-examination, BEC's counsel engaged in a colloquy with Hargett about the ACE Policy. Before BEC could introduce the ACE Policy itself, however, the court called a sidebar to discuss that document's potential introduction. After a lengthy debate, the court ultimately excluded the ACE Policy.

In a conference on proposed jury instructions, BEC asked for an instruction stating that the court had previously declared the Master Agreement ambiguous regarding the amount of BTI coverage. The court, however, noted that BEC had failed to cite any law in support of its proposed instruction, and then moved on while noting that it was "not saying no yet" to the instruction. The parties then discussed BEC's proposed instructions regarding Tennessee statutory law on rental companies acting as insurance agents that, according to BEC, Enterprise had violated. The court rejected these instructions, although not before BEC's counsel declined an invitation to argue in support of one of them. The instructions submitted to the jury did not contain BEC's proposed instructions on ambiguity or state law concerning rental companies acting as insurers.

The jury returned a verdict in Enterprise's favor by finding that BEC had failed to prove that Enterprise agreed to provide $750,000 in BTI coverage to BEC. This appeal followed.

## II.    ANALYSIS

BEC appeals numerous issues related to its motion for partial summary judgment and rulings made by the district court at or before trial, which we take up in turn below.

### A.    BEC's Motion for Partial Summary Judgment

BEC first argues that the district court should have interpreted the Master Agreement as a matter of law on its motion for partial summary judgment. Litigants may move for partial summary judgment on portions of any claim or defense, and courts must grant such motions "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Where—as here—a district court denies summary judgment based on legal insufficiency, we review that denial de novo. *McMullen v. Meijer, Inc.*, 355 F.3d 485, 489 (6th Cir. 2004).

BEC's partial summary judgment motion asked the district court to "order" four statements:

1. The minimum financial responsibility limit in Tennessee for vehicles with a gross vehicle weight rating of 10,000 pounds or more is $750,000;

2. Under the Ace Policy, the "retained limit" is $750,000 because that is the minimum financial responsibility limit *required* by Tennessee under the undisputed facts of this case;

3. Under the Ace Policy, the "retained limit" is [Enterprise's] obligation;

4. Under the Ace Policy, [Enterprise] must tender $750,000 in coverage to Ballentine pursuant to its "retained limit" obligation.

R. 133, Pl's Mot. for Partial Summ. J., PageID 1087.

In its summary judgment order, the district court noted that BEC's amended complaint asked the court to construe BEC and Enterprise's rights under the Master Agreement, the insurance liability protection purchased by BEC from Enterprise, and relevant state and federal law—none

of which includes the ACE Policy. Enterprise's complaint, moreover, stated that the ACE Policy was "unrelated to Enterprise's liability protection obligations." Given this contradiction, the district court did not err in concluding that BEC was "rais[ing] new claims at the summary-judgment stage," which required it to "first move to amend [its] pleadings under Federal Rule of Civil Procedure 15(a)." *Davis v. Echo Valley Condo. Ass'n*, 945 F.3d 483, 496 (6th Cir. 2019).

BEC submits that the district court improperly focused on whether Enterprise had "notice" of the ACE Policy. But the question that the district court evaluated was not whether Enterprise had notice of the ACE Policy. Rather, the question was whether BEC's complaint fairly encompassed a claim for judgment based entirely on the ACE Policy, or whether such a claim was newly presented at the summary judgment stage. The district court reasonably concluded that BEC's motion represented a new claim.

BEC also argues that the district court erred when it focused solely on the ACE Policy, not on whether the undisputed evidence otherwise entitled BEC to judgment as a matter of law. The plain language of BEC's motion, however, shows that BEC asked the court to declare judgment based solely on an interpretation of the ACE Policy—not based on any other agreement. The district court was entitled to rely on the language in BEC's motion to find that once it determined that an interpretation of the ACE Policy could not properly support summary judgment, there was no obligation to proceed any further.[1]

Finally, even if the district court had erred in declining to reach the merits of BEC's motion, any error would have been harmless. BEC argues that the term "BTI" in the Master Agreement

---

[1] The district court's conclusions are further supported by our caselaw explaining that at the summary judgment stage, "the liberal pleading standards" that apply at the motion to dismiss stage "are inapplicable." *J.H. v. Williamson County*, 951 F.3d 709, 722 (6th Cir. 2020) (quoting *Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005)).

was ambiguous, that it was tied to the also-ambiguous term "retained limit" in the ACE Policy, and that these ambiguities should have been construed as a matter of law against BEC. *See Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 612 (Tenn. 2006) (noting that ambiguous contractual provisions are generally construed against the contract's drafter); *Fisher v. Revell*, 343 S.W.3d 776, 780 (Tenn. Ct. App. 2009) (applying this principle to insurance contracts). But BEC's summary judgment motion never argued that BTI was ambiguous—as discussed above, BEC did not ask the district court to interpret the Master Agreement at all. In addition, because Enterprise is the insured party in the ACE Policy, it would be improper to construe against it any ambiguity in the phrase "retained limit." Even if BEC had requested that the district court use the ACE Policy as extrinsic evidence to interpret the Master Agreement, therefore, factual disputes about the meaning of the ACE Policy would properly have precluded summary judgment. The district court did not err in denying BEC's motion for partial summary judgment.

### B. Exclusion of the ACE Policy at Trial

BEC next challenges the district court's exclusion of the ACE Policy at trial pursuant to Federal Rule of Evidence 403. That rule permits a court to exclude relevant evidence if its probative value is "substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. The district court excluded the ACE Policy based on concern that it would confuse the jury.

Mindful of our distance from trial itself, we review all evidentiary rulings for abuse of discretion, reversing only if "left with the definite and firm conviction" that the district court made a clear error in its analysis. *United States v. Roberts*, 919 F.3d 980, 985 (6th Cir. 2019) (quoting *United States v. Wagner*, 382 F.3d 598, 616 (6th Cir. 2004)). Review of a district court's Rule 403

determination is even more deferential: "We reject the trial court's balancing only when we are firmly convinced that the district court erred, and, even then, only if that error resulted in substantial injustice." *Id.*

The ACE Policy is an excess insurance contract. Under the Policy, when a covered individual has a claim, Enterprise is obligated to pay to that individual a "retained limit," and ACE pays the difference between that retained limit and specified upper insurance limits. BEC's theory was that two aspects of the ACE Policy suggested that Enterprise had agreed to provide $750,000 in BTI coverage through the Master Agreement. BEC pointed to "the definition of retained limit" in the ACE Policy, and flagged the "notice provision" of the Policy.

The ACE Policy defines "retained limit" as "the minimum financial responsibility limit required by state." BEC sought to tie this language to Tennessee's requirement that certain motor carriers retain $750,000 in liability insurance. *See* Tenn. Comp. R. & Regs. 1340-06-01.07(1)(a). But the wording of the "retained limit" definition does not signal whether it ties to the Tennessee provision cited by BEC. The district court, moreover, had already concluded at the motion to dismiss stage that this and related state statutes apply to motor carriers rather than to insurers, and Enterprise entered evidence indicating that it and ACE—the parties to the ACE Policy—had long interpreted the retained limit definition to reference a different provision of Tennessee law that sets lower limits. *See Kiser v. Wolfe*, 353 S.W.3d 741, 748 (Tenn. 2011) (noting that "the paramount rule" in construing an insurance contract under Tennessee law "is to ascertain the intent of the parties" (quoting *Blue Diamond Coal Co. v. Holland-Am. Ins. Co.*, 671 S.W.2d 829, 833 (Tenn. 1984))). On this record, permitting BEC to argue that the ACE Policy's definition of "retained limit" imposed a $750,000 obligation on Enterprise had the potential to mislead or confuse the jury.

The ACE Policy's notice provision, meanwhile, required Enterprise to give ACE notice if Enterprise believed that an accident "may result in a claim" for damages "likely to meet or exceed either 75% of the applicable Limit of Insurance or $750,000." BEC argued to the district court that this notice provision would "not include $750,000 if there weren't some situations in this policy that that retained limit could go up to $750,000." But this provision connects Enterprise's notice obligation to the size of the insured's claim, not to the amount of Enterprise's retained limit. A different provision of the Policy, moreover, uses "claims" separately from "retained limit," strongly suggesting that the two terms have different meanings. *Cf. Donovan v. FirstCredit, Inc.*, 983 F.3d 246, 257 (6th Cir. 2020) (describing the canon against surplusage, under which one phrase should not "needlessly be given an interpretation that causes it to duplicate another provision" (quoting *Nielsen v. Preap*, 139 S. Ct. 954, 969 (2019))). So it was reasonable for the district court to question the probative value of what, in its words, amounted to "a reference somewhere in a 40-page document that says the same number that [BEC] want[ed] to advance."

The ACE Policy's probative value was further limited by the Policy's disconnect from the sole issue in the case: the amount of BTI coverage provided by Enterprise to BEC. Even setting aside the above-chronicled issues with BEC's interpretation of the "retained limit" and notice provisions, the ACE Policy was not the Master Agreement. Its language only represented, at most, circumstantial evidence of the meaning of the Master Agreement's provisions.

The district court also rightly recognized the substantial confusion that could result from the ACE Policy's introduction. Broadly, the jury would have been exposed, near the very end of trial, to a new lengthy and confusing insurance policy different from the Master Agreement. In particular, the jury could easily have been misled by the notice provision's reference to $750,000,

which—as described above—was not reasonably connected to Enterprise's obligations under the ACE Policy, let alone to its obligations under the Master Agreement.

After extensive argument from both sides, the district court conducted the balancing required by Rule 403, and concluded that the risk of confusion substantially outweighed the Policy's probative value. Given the significant deference afforded to trial courts regarding Rule 403 determinations, this course of conduct leaves us with no firm conviction that the district court erred, nor that any error resulted in substantial injustice. *Roberts*, 919 F.3d at 985. We affirm the district court's exclusion of the ACE Policy.

### C.  Breach of Contract Claims

BEC next takes issue with the district court's decision not to charge the jury with deciding breach of contract and failure to procure claims—both of which, on appeal, BEC characterizes as breach of contract claims. The court discussed these purported claims with the parties at the February 3, 2023, pretrial conference and the morning of trial, ultimately deciding not to add them to the proposed verdict form.

BEC's operative complaint is titled "FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT." In its section requesting relief, BEC specifies six times that it is seeking a "Declaratory Judgment," and never asks for any damages to be provided through the Tennessee suit.

Although BEC argues that the district court should have evaluated its complaint under the plausibility and notice standards applicable at the motion to dismiss stage, "the liberal pleading standards" that apply at the motion to dismiss stage "are inapplicable" at summary judgment or later. *J.H.*, 951 F.3d at 722 (quoting *Tucker*, 407 F.3d at 788). Regardless, under any standard, BEC's suit was one for a declaratory judgment, not breach of contract. BEC criticizes the district

court for focusing on the "technicalities of the Amended Complaint's title and request for relief." Appellant's Br. at 46. But the request for a declaratory remedy, in particular, is no mere technicality—it is the core feature distinguishing a declaratory judgment action from other types of cases. *See DiAnoia's Eatery, LLC v. Motorists Mut. Ins. Co.*, 10 F.4th 192, 204 (3d Cir. 2021) (noting that by seeking a declaratory judgment, "[t]he plaintiff, as master of the complaint," makes "a genuine choice to limit the relief sought"). That the complaint alleged contract breaches en route to requesting declaratory relief does not alter the fact that BEC simply did not plead a contract breach claim. To accept BEC's argument, the district court would have had "to rewrite the complaint to set forth a claim" for breach of contract—which was "not [its] responsibility." *Cornett v. Magnum Hunter Prod., Inc.*, 585 F. App'x 316, 317 (6th Cir. 2014) (per curiam).

Finally, any error in declining to permit breach of contract claims was harmless. As Enterprise notes, to award \$750,000 in damages on a contract breach claim, the jury would have had to conclude that Enterprise offered BEC \$750,000 in coverage. But the jury's verdict rejected that position. BEC fails to respond to this argument in its reply brief, a choice that "only underscores [Enterprise's] point." *Williams v. WCI Steel Co., Inc.*, 170 F.3d 598, 607 (6th Cir. 1999). The district court did not err in limiting trial to a declaratory judgment action.

### D. BEC's Continuance Motion

BEC also challenges the district court's denial of BEC's motion to continue the trial. "[T]he granting or denial of a continuance is a matter within the discretion of the trial judge and will not be reversed on appeal unless there has been a clear abuse of discretion." *Prime Rate Premium Fin. Corp. v. Larson*, 930 F.3d 759, 766 (6th Cir. 2019) (quoting *Scholl v. Felmont Oil Corp.*, 327 F.2d 697, 700 (6th Cir. 1964)). Given the "broad flexibility" provided to district courts

in scheduling trial, "[i]t is hard to imagine an area in which an appellate court should give a trial court more leeway than in . . . considering continuance motions." *Id.*

BEC asked for a continuance because the district court's comments at pretrial conferences left BEC concerned that it would be hamstrung in presenting its case. But BEC points to no precedent suggesting that learning the trial court's leanings about evidentiary and other matters during pretrial conferences justifies a continuance. This absence of supportive caselaw is unsurprising. After all, pretrial conferences are optional. Fed. R. Civ. P. 16(a) ("In any action, the court *may* order the attorneys and any unrepresented parties to appear for one or more pretrial conferences . . . ." (emphasis added)). "In managing the course of a trial," moreover, a court "may wait to make a definitive evidentiary ruling until its decision can be informed by a fuller context." *Spencer v. Young*, 495 F.3d 945, 949 (8th Cir. 2007); *see also Luce v. United States*, 469 U.S. 38, 41 (1984) (noting that deferring evidentiary rulings to trial is often advisable because reviewing courts are regularly "handicapped in any effort to rule on subtle evidentiary questions outside a factual context"). By previewing its expectations at a pretrial conference, a court improves litigants' ability to prepare for trial. It would be counterintuitive to penalize that practice by treating information shared at a conference as grounds for a continuance motion from a party that takes issue with anticipated rulings.

In any event, there were good reasons for the court to be skeptical of the admissibility of the ACE Policy. Similarly, any expectation by BEC that it could present breach of contract claims at trial was unreasonable given the plainly declaratory relief sought in the complaint.[2] Finally,

---

[2] In its appellate briefing, BEC argues that it was also prejudiced by the timing of the entry of the district court's pretrial order and by not being able to discuss the Master Agreement's ambiguity with the jury. But neither of those issues was mentioned in BEC's continuance motion. The district court cannot be faulted for failing to consider reasons to grant a continuance that were not raised by BEC's motion. BEC also argues that it was prejudiced by some of the district court's decisions made the morning of trial. Those decisions, however, necessarily are unrelated to BEC's continuance motion, which was filed before trial and relied on alleged prejudice from pretrial conferences.

BEC has failed to show that it was prejudiced by the denial of the motion, which precludes a finding of abuse of discretion. *Perkins v. Am. Elec. Power Fuel Supply, Inc.*, 246 F.3d 593, 605-06 (6th Cir. 2001). In neither its continuance motion nor its appellate briefing has BEC suggested any "additional witnesses or evidence" that it would have produced had a continuance been granted. *Id.* at 606. The district court did not abuse its discretion by denying BEC's continuance motion.

### E.      Proposed Jury Instructions

BEC contends that the district court erred by not including jury instructions about the Master Agreement's ambiguity or about Tennessee statutes that Enterprise allegedly violated. The failure to provide a requested jury instruction is reviewed for abuse of discretion. *United States v. Reed*, 72 F.4th 174, 184 (6th Cir. 2023). In this context, abuse of discretion occurs "only if (1) the instructions are correct statements of the law; (2) the instructions are not substantially covered by other delivered charges; and (3) the failure to give the instruction impairs the [party's] theory of the case." *Id.* (quoting *United States v. LaVictor*, 848 F.3d 428, 454 (6th Cir. 2017)).

BEC's proposed instruction on ambiguity would have told the jury that the district court had already found the Master Agreement ambiguous concerning the amount of BTI coverage provided by Enterprise to BEC. Disclosing that the Master Agreement had previously been construed as ambiguous, however, would not have changed the jury's fundamental task of determining the amount of BTI insurance provided by Enterprise to BEC. Although BEC alleges that without the ambiguity instruction, the jury would not have known it was allowed to consider extrinsic evidence, the instructions that were used told the jury to consider all available evidence and did not indicate that extrinsic evidence should be excluded. A separate instruction also told the jury that it could resolve ambiguities in the Master Agreement in BEC's favor if it concluded

that Enterprise drafted the contract. BEC has failed to show that the absence of its requested ambiguity instruction imperiled its theory of the case. *See Reed*, 72 F.4th at 184.

The relevant instructions on Tennessee law, meanwhile, would have informed the jury of statutory requirements that Enterprise allegedly violated when providing insurance to BEC. *See* Tenn. Code Ann. § 56-6-104(b)(9). But the exclusion of these instructions appropriately kept the jury's focus on the amount of BTI insurance in the Master Agreement. BEC contends that the instructions' exclusion left it "unable to attack Enterprise's credibility for its failure to follow the very rules that allow it to sell insurance to rental customers" and prevented it from "disclos[ing] Enterprise's statutory violations that were directly related to the issues at trial." But BEC does not point to any example of the district court preventing BEC from arguing, during trial, that Enterprise breached Tennessee law and that such a breach was relevant to the issue presented in the case. As with the ambiguity instruction, therefore, BEC has not shown that the exclusion of instructions on state law imperiled its case. It thus has not shown an abuse of discretion. *Reed*, 72 F.4th at 184.[3]

### F.  Mr. Ballentine's Prior Conviction

BEC next appeals the district court's decision allowing Enterprise to cross-examine Mr. Ballentine using his prior felony conviction. A litigant may challenge a non-defendant witness's "character for truthfulness by evidence of" a less-than-ten-year-old criminal conviction carrying potential punishment of over one year unless that conviction fails Rule 403's balancing test. Fed.

---

[3] In addition, the trial record shows that BEC contributed to the exclusion of its requested instructions. The court failed to include BEC's jury instruction on ambiguity because BEC did not provide any caselaw in support. As for the Tennessee statutory instructions, although the district court summarily rejected one instruction that did not cite the applicable statute, it gave BEC an opportunity to be heard on an analogous instruction that did cite the relevant law. Counsel declined the invitation. Arguably, failing to argue for this instruction when the district court provided an opportunity to do so constituted waiver, which "we never review." *United States v. Akridge*, 62 F.4th 258, 263 (6th Cir. 2023); *see Howe v. City of Akron*, 723 F.3d 651, 660-61 (6th Cir. 2013) (failing to object to the court's failure to give a proposed instruction during a charging conference constitutes waiver). At the least, because BEC "contribute[d] in some way" to the exclusion of its preferred instructions, reversal would be warranted only to prevent "manifest injustice." *Akridge*, 62 F.4th at 263 (quoting *United States v. Woods*, 61 F.4th 471, 481 (6th Cir. 2023) (cleaned up)). For the reasons provided, no manifest injustice occurred here.

R. Evid. 609(a)(1)(A). Ballentine pleaded guilty to an aggravated assault charge in January 2022, a conviction that could have led to over a year in prison. Under Rule 609, therefore, the district court was required to permit impeachment of Ballentine using his conviction unless the conviction's probative value was substantially outweighed by the unfair prejudice it would cause BEC. *See* Fed. R. Evid. 403.[4] We review Rule 403 determinations for abuse of discretion, and will not reverse absent substantial injustice. *Roberts*, 919 F.3d at 985.

Although there was documentary evidence at trial, much came down to a credibility determination. Ballentine testified that he and Enterprise understood that BEC had been offered $750,000 in BTI coverage, while Enterprise's lead witness portrayed such an offer as both inaccurate and impossible. Given that context, BEC's assertion that Ballentine's "testimony was not 'central' to the issues at trial" is difficult to credit. On the contrary, this was a case in which "the assessment by the jury of which witnesses to believe was crucial," rendering "the probative value" of Ballentine's prior conviction "high." *United States v. Lattner*, 385 F.3d 947, 961 (6th Cir. 2004); *see also, e.g.*, *Am. Modern Home Ins. Co. v. Thomas*, 993 F.3d 1068, 1071 (8th Cir. 2021) (prior convictions are admissible for impeachment where the witness's "credibility" is "paramount").

To be sure, the jury may have doubted Ballentine's credibility after it learned of his prior conviction. But unfair prejudice within Rule 403's meaning results only from "evidence that has an 'undue tendency to suggest decision on an improper basis.'" *United States v. Smith*, 70 F.4th 348, 353 (6th Cir. 2023) (quoting *Old Chief v. United States*, 519 U.S. 172, 180 (1997)). By

---

[4] BEC cites our caselaw requiring the district court to "make an on-the-record finding based on the facts that the conviction's probative value substantially outweighs its prejudicial impact." *United States v. Collins*, 799 F.3d 554, 571 (6th Cir. 2015) (quoting *United States v. Meyers*, 952 F.3d 914, 917 (6th Cir. 1992)). But that rule reflects the standard for, and is applicable only to, convictions entered over ten years before their use for impeachment. *Id.*; *see* Fed. R. Evid. 609(b).

making recent criminal convictions presumptively admissible to impeach non-defendant witnesses, Rule 609(a)(1)(A) represents Congress's judgment that such admission is not inherently unfair. *See United States v. Jones*, 554 F. App'x 460, 473 (6th Cir. 2014) (White, J., concurring); *see also* 28 Charles A. Wright & Victor J. Gold, Federal Practice and Procedure § 6134 (2d ed. 2012) ("[C]onviction evidence offered against witnesses other than the accused rarely should be excluded."). When Enterprise attempted to examine the details of Ballentine's prior convictions, moreover, the court appropriately "reduce[d] the chance of prejudice by providing limiting instructions to the jury." *Smith*, 70 F.4th at 353. The court's command that Ballentine's conviction could only be considered for credibility purposes—and its corresponding jury instruction— mitigated the possibility that the conviction would unfairly "arouse the jury's hostility . . . without regard to the probative value of the evidence." *Id.* (quoting 1 Robert P. Mosteller et al., McCormick on Evidence § 185 (8th ed. 2020)). The district court did not abuse its discretion by permitting the use of Mr. Ballentine's prior conviction.

### G. Admission of the Shelter Policy

Finally, BEC takes issue with the district court's decision to permit Enterprise to introduce the Shelter Policy during its cross-examination of Mr. Ballentine. BEC moved before trial to exclude this Policy as irrelevant under Federal Rule of Evidence 401 or, in the alternative, as confusing and unfairly prejudicial under Rule 403. BEC also unsuccessfully objected to the introduction of parts of the Policy during Ballentine's cross-examination. We review the district court's evidentiary determinations for abuse of discretion. *Roberts*, 919 F.3d at 985.

Enterprise introduced two aspects of the Shelter Policy—(1) the "declarations" page, and (2) the "MCS-90." Among other things, these excerpts showed that BEC was receiving $1,000,000 in surety coverage through Shelter and that BEC was paying significantly more per

day for this coverage than it paid Enterprise for BTI. According to Enterprise, these facts indicated that BEC did not need an additional $750,000 of coverage, which undermined BEC's argument that it agreed to pay Enterprise for that insurance. Enterprise also used the Shelter Policy's high cost to suggest that, at the lower price BEC paid for BTI, BEC could not have believed it was receiving $750,000 in coverage from Enterprise. This represents probative value legitimately assigned to the relevant portions of the Shelter Policy.[5]

BEC argues that the Shelter Policy had the capacity to confuse and prejudice the jury. It notes that while the prices paid for both policies were different, it was not an "apples to apples" comparison because the Shelter Policy provided more forms of coverage than did the Master Agreement. And it notes that the Shelter Policy's apparent coverage for the injured party in Mississippi could have biased the jury against BEC in this case regardless of whether the Master Agreement provided BEC $750,000 worth of insurance.

Although these concerns are not unreasonable, they were addressable during BEC's redirect examination of Mr. Ballentine. *See Barnes v. City of Cincinnati*, 401 F.3d 729, 744-45 (6th Cir. 2005) (indicating that redirect examination can help cure prejudice). BEC partially availed itself of that opportunity by having Ballentine explain why, despite the Shelter Policy, he nonetheless believed that he had additional coverage through Enterprise. The district court also provided BEC an opportunity to question Ballentine further about the Shelter Policy, but BEC's counsel declined the invitation. Keeping in mind the significant deference afforded district courts in Rule 403 determinations, the court did not abuse its discretion in permitting use of the Shelter Policy. *Roberts*, 919 F.3d at 985. Nor, particularly given the relatively minor focus on the Policy

---

[5] These same facts also render the Shelter Policy relevant under Rule 401. *See* Fed. R. Evid. 401 (noting that evidence is relevant if it has any tendency to make a material fact more or less probable).

at trial, has BEC shown that its use created substantial injustice. *Id.* We affirm the district court's

decision to permit the introduction of the Shelter Policy.

### III.    CONCLUSION

For the foregoing reasons, the decisions below are **AFFIRMED**.